Filed 1/27/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| R.M., | D064922 |
| Respondent, | |
| v. | (Super. Ct. No. D528261) |
| T.A., | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Law Office of Leslie Ellen Shear, Leslie Ellen Shear and Julia C. Shear Kushner, for Appellant.

R.M., in pro. per., for Respondent.

In this family law proceeding, T.A. (Mother) appeals from a judgment finding that R.M. (RM) is the presumed father of Mother's biological daughter (Child).  Mother conceived Child through artificial insemination procedures, and RM is not the biological father.  The trial court declared RM to be Child's presumed father by applying the

parentage presumption set forth in Family Code section 7611, subdivision (d) (hereafter, section 7611(d)).[1]  This statutory provision creates a presumption that a person is the natural parent of a child if the person shows by a preponderance of the evidence that he or she received the child into his or her home and openly held the child out as his or her own child.  Also, the statutory scheme allows an opposing party to rebut the presumption by clear and convincing evidence.  (§ 7612, subd. (a).)

Mother claims she chose to be a single parent of Child and raises numerous constitutional and other legal challenges to the manner in which the presumed parent statutory scheme was applied in her case.  Based on the fundamental constitutional right to parent one's child without interference, she requests that we establish a rule that a decision to form a single parent family should be afforded the same constitutional protection as a two parent familial arrangement.  She also asserts the standards associated with the presumed parent statute do not adequately protect the constitutional rights of a single parent "by choice."

We hold that application of the presumed parent statutory scheme in this case did not constitute an unconstitutional interference with Mother's fundamental right to parent her child.  We conclude (1) the section 7611(d) parentage presumption serves the legitimate state interest in providing stability for children who have a parental relationship with the person afforded presumed parent status; (2) because the statutorily-prescribed requirements for the presumption necessitate *a fully-developed parental*

---

[1]	Subsequent unspecified statutory references are to the Family Code.

2

*relationship between the person and the child*, the statute ensures that application of the presumption will not deprive a parent of his or her right to raise a child without interference by a *nonparental* figure; and (3) there is no basis for us to alter the long-established standards that govern the presumed parent statutory scheme.

Mother also contends the trial court misunderstood and misapplied the law, including by (1) evincing a judicial preference for a two parent familial arrangement rather than affording equal weight to her single parent choice, and (2) stating the parentage presumption in this case was not rebuttable because no other person was seeking presumed parent status. As we shall explain, we reject these contentions of reversible error.

Finally, interspersed with her various constitutional and other legal challenges, Mother in effect asserts there is insufficient evidence to support the court's presumed parent finding. As set forth above, we first independently review Mother's contentions of legal error, and then consider her claim that the court should have weighed the facts in a different manner, which in essence is a challenge to the sufficiency of the evidence.[2] We hold the evidentiary record supports that RM is Child's presumed parent and that the presumption was not rebutted.

---

[2] In her appellate briefing, Mother does not expressly identify her arguments as including a challenge to the sufficiency of the evidence, but rather for the most part frames her challenges as derived from claims of constitutional and other legal error.

FACTUAL AND PROCEDURAL BACKGROUND[3]

Mother resides in San Diego, and RM lives in New Orleans, Louisiana. They each own homes in their respective states and were never married. They met in 2004 in New Orleans while Mother was stationed there in the Navy between 2003 and 2005. After Mother returned to San Diego, Mother conceived Child by artificial insemination procedures with the sperm of an anonymous donor. Child was born in San Diego in March 2008, and five months later Mother retired from the Navy. During the first two years of Child's life, Mother and RM maintained a long distance relationship, during which Mother and Child regularly stayed with RM at his Louisiana home. In July 2010, Mother gave birth to another daughter (Second Child) in San Diego; this child was conceived naturally and is RM's biological child. Mother ended her relationship with RM in 2010. Mother does not dispute that RM has parental rights as to his biological child, but claims he has no parental rights concerning Child.

In March 2011, RM filed a petition to establish a parental relationship between himself and Child. (§ 7650, subd. (a).)[4]

---

[3] Under well-settled appellate standards, we summarize the evidence in the manner most favorable to the judgment. (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 362, 369 (*Charisma R.*); *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405.) In her reply brief, Mother properly states we should not consider any claims raised by RM in his pro. per. respondent's brief that are unsupported by record citations or incorrectly refer to matters in the record. Our summation is based on the record and we do not rely on any statements by either party that are not reflected in the record.

[4] Section 7650, subdivision (a) provides that "[a]ny interested person" may bring an action to determine the existence or nonexistence of a parental relationship.

4

Mother and RM testified at trial, along with several other witnesses called to support their respective positions. Mother testified that when she and RM were first dating, she told him that her plan was to become a single mother. She started preparing for artificial insemination while in Louisiana, and she turned down a promotion and decided to give up her career in the Navy so she could become a "single mother and do this on [her] own." She requested and obtained a transfer to San Diego where she received fertility and insemination treatments for about 17 months, using donated sperm from a sperm bank. After undergoing an in vitro insemination procedure, she discovered she was pregnant in July 2007.

Mother testified that she and RM had ended their relationship before she moved back to San Diego. However, after she had been undergoing artificial insemination treatments for about one year, they started dating again. According to Mother, RM was not involved in the treatments and she did not use his sperm during the treatments. RM testified he thought Mother was trying to get pregnant with his sperm; he provided his sperm to a San Diego sperm bank for this purpose; and he did not discover she did not use his sperm until she told him after she was pregnant.[5]

---

5    Mother acknowledged that RM deposited a sample at a sperm bank, but claimed he did this not for donation purposes but to get his sperm tested for diseases or other conditions. Mother's mother (Grandmother) acknowledged that RM donated sperm, and testified that RM wanted to be the father of Mother's child, but Mother denied his request and did not use his sperm because she had been "working on this for years to get pregnant, and she didn't know him that well and decided that she did not want him to be the father."

According to RM, even though he was not the biological father, in the summer of 2007 after Mother was pregnant she asked him to be Child's father, and he agreed. RM testified that Mother asked him to help her raise Child and told him she wanted Child to have a father because she did not have one. Mother testified she never said this to RM, and it was "inconceivable" to her that after undergoing artificial insemination treatment for years she would make a decision to allow him to be the father a few weeks after she became pregnant.

RM made several trips to visit Mother in San Diego before and at the time of Child's birth. He was present at a sonogram, attended a birthing class with Mother, drove Mother and Grandmother to the hospital for Child's birth, and was at the hospital when Child was born. Grandmother (but not RM) stayed with Mother during the actual birth. While Mother was recovering, RM stayed with Child during the first two hours of her life in the Neonatal Intensive Care Unit. He also accompanied Child when she had to leave the hospital room for hearing tests and other procedures, and spent the night at the hospital during Mother's and Child's stay there.

According to RM, he was generally recognized by the hospital staff as Child's father. He acknowledged he was not listed on the birth certificate as Child's father, and he did not object when Mother told hospital staff that Child was conceived through a sperm donor and thus there was no father to list on the birth certificate. He also acknowledged that he signed a declaration of paternity at the hospital for Second Child but did not do this for Child. He explained that at the time of Child's birth no one offered him this form and he did not know about it.

RM returned to Louisiana about one week after Child's birth. Mother did not identify RM as Child's father on Child's birth announcement. RM returned to San Diego to attend Child's baptism, but he was not identified on Child's baptism certificate as the father.

RM submitted evidence delineating funds he spent from August 2007 through May 2011 to prepare for Child's birth and to help provide for Child after her birth, including for the purchase of maternity clothes, nursery supplies and furniture, other children's items (i.e., a car seat, playpen, high chair, swing set, sand box, and club house), children's books, clothes, diapers, toys, videos, other gifts and supplies, Christmas and birthday parties, food, vacations and other outings, and repairs at Mother's home. In May 2008, RM filled out an employment-related life insurance policy form that designated Child as his daughter and named her as the primary beneficiary, and designated Mother as his fiancée and a 50 percent secondary beneficiary. In March 2009, RM named Child as a beneficiary on a different insurance policy application.

Mother did not dispute that she regularly visited RM in Louisiana and stayed at his home with Child during the two years after Child's birth. On some occasions Grandmother (who lived in Arizona) accompanied Mother and Child on these trips and stayed with them at RM's home. According to Mother, she would typically stay in Louisiana with RM for about two to six weeks at a time, and then return to San Diego for a couple of months. She testified that she and Child were in Louisiana in 2008 in May, June, October, and December; in 2009 in February, March, August, and from October through December; and in 2010 from February to April. RM testified he would visit

7

Mother and Child in San Diego during the holidays if they were not in Louisiana or on trips elsewhere.

RM's Louisiana home was equipped with a high chair for Child, and RM and Mother turned RM's office into a playroom for Child. When Mother and Child stayed with RM in Louisiana, the couple shared grocery shopping duties. In 2008 Mother filed state income taxes in Louisiana as a "part-year resident"; at some point she set up a college savings plan in Louisiana for Child; during a visit in August 2009 she acquired a Louisiana driver's license and registered her car in Louisiana; and she had her mail temporarily forwarded to RM's home during visits in December 2009 and February 2010. During the December 2009 visit, Mother discovered she was pregnant with Second Child.

RM presented evidence showing numerous activities and outings he engaged in with Child, and he submitted numerous photographs depicting Child's interactions with him and his family. For example, RM, Mother, and Child attended Mother's retirement ceremony in August 2008; went on a vacation to Florida in the summer of 2008 with RM's family and friends; participated in an alligator swamp tour in the fall of 2008 in New Orleans; celebrated Halloween and Christmas in 2008 in Louisiana; were together for Mardis Gras and Child's birthday in 2009 in Louisiana; attended a circus in New Orleans in the summer of 2009; celebrated Thanksgiving and Christmas in Louisiana in 2009; rode in the Mardi Gras parade in early 2010; and held a birthday party for Child at a New Orleans park in March 2010 when Child turned two years old.

The photographs submitted by RM depicted Child and RM together, as well as Child with a variety of RM's family members. These included pictures taken of Child

8

and RM at Mother's home during the first few weeks after Child's birth; of RM holding Child for her first plane trip; of RM holding Child at her baptism in San Diego; and of Child lying with RM in his bed at his home. There were pictures showing Child with RM and/or RM's relatives (including his mother, siblings, nieces, and nephews) on such occasions as Child's baby shower, Halloween, Christmas, Thanksgiving, Child's birthday, and vacations and recreational outings. Other photos showed RM holding Child in Washington, D.C. during a trip for Mother's Naval Academy reunion; RM with Child in Louisiana while Child was doing such things as sitting in a laundry basket, trying to help him cook, accompanying him inside an election booth, and sitting with him in a chair; and of RM with Child and Second Child at Mother's home two days after Second Child's birth. In one photograph, taken when RM took Child on an outing in Louisiana, Child was wearing a t-shirt stating "Daddy's Little Sweetheart."

RM also introduced evidence of cards and artwork projects he had received from Mother on behalf of Child that identified him as Child's father. In February 2009, Mother mailed RM a Valentine's Day card from San Diego to Louisiana; the envelope is addressed to "Dad" and the enclosed card states "I [heart symbol] U Dad" and is signed "Love, [Child]." In May 2009, Mother and Child made RM a t-shirt; the t-shirt states "Child [heart symbol] Dad" and contains handprints and footprints; and in the summer of 2009 RM wore this t-shirt in a professional portrait taken of RM and Child. In June 2009, Mother gave RM a card for his birthday that stated "You're the best, Daddy!" and that was signed "Love, [Child]."

9

RM testified that Child called him "Daddy"; he and Mother referred to him by this name; and when he gave presents to Child he would write that the gift was from "Daddy" or from "Mommy and Daddy." Mother acknowledged she sent cards and other items referring to RM as dad, and also acknowledged she had addressed RM as "Daddy" in Child's presence. However, she claimed this was merely a "pet name" she used as a term of endearment and to cheer up RM when he underwent some legal difficulties.

RM testified he and Mother attended church with Child in Louisiana; they held themselves out as a family at church; and their names were listed together in the church directory using his last name for both of them as if they were a married couple. In April 2010, Mother registered Child to attend a program two to three days a week at RM's church in Louisiana that would start in the fall. On the registration form, Mother identified Child's father as RM and Child's address as RM's address.[6] On April 21, 2010, Mother left Louisiana and returned to San Diego, and did not thereafter go back to Louisiana.

In June 2010, around the time of Father's Day, Mother mailed RM several items, including a card with large cut-out letters stating "Dad" and signed by Mother with Child's name; a cut-out paper tie with "Dad" written on it; and a card stating "Daddy" and

---

[6]     Mother testified she did not initially identify RM as the father on the form but he became angry because he did not want to look like a "fool" at his church; at that point the relationship "was over" and she was leaving in a few days; and she agreed to put him down " 'like an emergency contact.' " She stated she registered Child in the program even though she had broken up with RM and was moving back to San Diego because she was pregnant with Second Child; she still had hope RM "might change"; and she registered Child to hold a spot in the program and leave her "doors open."

10

"Happy Father's Day from Your Little Girl" which was signed "Love, [Child]" in Child's handwriting.7

When Mother gave birth to RM's biological child (Second Child) in July 2010, RM came to San Diego, although according to Mother he did not stay at Mother's residence. On August 14, 2010, RM and Mother had professional family portraits taken for the occasion of Second Child's birth, one depicting RM, Mother, Child and Second Child together, and others showing RM with the two daughters together and with each daughter alone.8

RM testified that although things were tense between him and Mother after she left Louisiana in April 2010, he did not realize their relationship was over until October 2010 when he was in San Diego for Halloween and was served with court papers concerning Second Child. Mother acknowledged that RM e-mailed her with requests to visit with Child after she left in April 2010. RM testified he and Mother had numerous discussions about him coming to San Diego to visit Child but Mother would tell him not to come, and after October 2010 Mother did not let him see Child. Mother testified RM

---

7     Mother testified that she sent the art project to RM even though they had broken up and she had left Louisiana "for good" because she was about to deliver RM's child (Second Child) and regardless of her feelings for RM she had a duty to try to maintain a cordial relationship with him so he could have a relationship with Second Child.

8     Mother testified that although she was trying to be cordial and she wanted RM to have a picture taken with his biological daughter, she did not want him in a photograph with Child but she complied because he insisted and she did not want to make a scene. To contradict Mother's claim, RM submitted into evidence an e-mail sent by Mother to RM in which Mother gave her view as to which picture was the best of RM and Child for purposes of selecting which ones to print.

never sent her any child support for Child, whereas RM testified he tried to send money and gifts for Child but Mother would not accept them.

According to RM, in March 2012 he received a middle-of-the-night phone call during which Child (then age four) was screaming that she wanted her daddy and missed her daddy. Mother acknowledged the phone call was made when she accidentally pushed RM's number on her cell phone, and stated Child was experiencing "night terrors" but was not screaming for daddy.

To corroborate his claims, RM presented testimony from a mutual Louisiana friend, and RM's brother, pastor, and neighbor. RM's brother testified that Mother referred to RM as Child's father, Child called RM "daddy," and the brother considered Child his niece. The pastor testified that RM, Mother, and Child attended numerous church activities during which they acted as a couple who were coparenting Child, and RM and Child acted as if they were father and daughter. RM's neighbor testified that during neighborhood get-togethers Mother referred to RM as Child's father, RM referred to Child as his daughter in Mother's presence, and Child called RM "Dad" or "Daddy." The neighbor often saw RM caring for Child, and the mutual friend testified that on a "girls' night out" Mother left Child with RM. In contrast, Mother presented testimony from Grandmother and two of Mother's friends (one who lives on the East Coast and the other in San Diego) who testified they had numerous discussions with Mother about her decision to be a single parent; RM was not involved in Mother's artificial insemination process; and they never heard RM being referred to as Child's father.

12

After hearing the evidentiary presentation and counsel's closing arguments, the trial court took the matter under submission and thereafter issued a written statement of decision. The trial court found RM had established by a preponderance of the evidence that he was Child's presumed father under section 7611(d) because he had received Child into his home and openly held Child out as his own.

In its detailed statement of decision, the trial court noted that RM "was, at one time, a substantial part of [Child's] life and appears motivated to resume that relationship," whereas Mother "appears motivated to be a single parent." The court further observed that Child's "conception was the culmination of a substantial emotional and financial investment by [Mother] to become a single parent," and thereafter Mother's multiple visits to RM caused Mother and Child to become "substantial stakeholders at [RM's] home, family, and community in Louisiana."

The court recognized that it was significant that RM did not seek to have his name on Child's birth certificate, nor did he acknowledge he was Child's father when given an opportunity to do so at the hospital. However, the court delineated other evidence showing that RM had satisfied the presumed parent requirements. The court cited RM's multiple trips to San Diego to help Mother during her pregnancy, and the fact he was present during Child's birth, expressed concern for her well-being, stayed every night at the hospital to be near Mother, and paid pregnancy and birth expenses "commensurate with his ability to do so." Further, the court assessed that the "record was replete with evidence" that, for as long as Mother permitted him to do so, RM cared for Child and received her into his home, family, and community.

13

The court rejected as unreasonable Mother's claim that her references to RM as "Dad" or "Daddy" were pet names that she used in intimate situations. Regarding RM's acknowledgement of Child as his daughter, the court stated: "If a picture is truly worth a thousand words, [RM] has, in effect, written a novel in acknowledging [Child] as his child." The court also found convincing the pastor's testimony that RM and Mother acted as a couple and coparented Child. As to Mother's witnesses who denied hearing RM acknowledge Child as his child, the court stated that one of Mother's friend's contacts with Mother were "limited and dated"; the other friend's testimony was undermined by her bias to support Mother; and Grandmother was "suspiciously reluctant" to acknowledge the obvious references to "Dad" and "Daddy" in various materials including the artwork and t-shirt created by Mother. In contrast, RM's witnesses testified in a manner consistent with a reasonable interpretation of these materials.

The court found that RM "appear[ed] to have lovingly acknowledged, without reservation, [Child] as his child to his entire family and community in Louisiana." The court determined that RM promptly took legal action to obtain custody of Child when he learned in late 2010 that Mother had ended their relationship and intended to keep Child from him. Although RM had not paid child support, the court found that he had been "generous with [Child] while he was allowed to do so," and given that Mother was refusing contact between Child and RM and returned RM's gifts and cards for Child, it was questionable how much, if any, support Mother would have accepted from RM. The court noted there had been some references to domestic violence during the testimony, but found allegations of abuse were not credible.

14

The court also observed that in her trial brief and closing arguments, Mother "argued her constitutional right to parent [Child], to the apparent exclusion of [RM]." The court stated that it had "already rejected this argument," and cited case authority in support of this conclusion.

After finding that RM had carried his burden to establish that he is a presumed father under section 7611(d), the court addressed the question of rebuttal of the presumption under section 7612, subdivision (a). The trial court stated the rebuttal provision did not appropriately apply in this case because there was a policy in favor of providing a child with two parents and no other person was competing for the second parent position. However, at RM's request, the court made an alternative ruling based on an assumption that section 7612, subdivision (a)'s rebuttal provision *was* applicable, and found that Mother had failed to carry her burden to show by clear and convincing evidence that RM should not be deemed Child's presumed father. In support, the court referred back to the reasons it had delineated when finding that RM had carried his burden to establish the presumption.

## DISCUSSION

### I. *Governing Law*

#### A. *The Fundamental Right To Parent and the Policy Supporting*
#### *Maintenance of Established Parental Relationships*

It is has long been established that parents have a fundamental liberty interest in the care, custody, and control of their children. (*Troxel v. Granville* (2000) 530 U.S. 57, 65 (*Troxel*).) In *Troxel*, the high court confirmed that this constitutional principle extends

15

to the fundamental right of parents to make decisions concerning the care, custody, and control of their children. (*Id.* at p. 66.) Based on this fundamental right, the *Troxel* court concluded that application of a state statute in a manner that gave a trial court full discretion to decide if paternal grandparent visitation was in a child's best interests, without requiring the court to give any special weight to the mother's determination as to the appropriate visitation amount, constituted an unconstitutional interference with the mother's constitutional rights.[9] (*Id.* at pp. 67-73.) To support its conclusion, the *Troxel* court stated a fit parent is presumed to be acting in the child's best interests, and a court should not be permitted to substitute its judgment regarding the child's best interests without having to give special weight to the parent's determination on this matter. (*Ibid.*)

The courts also recognize that a child's best interests is a core public policy concern that underlies statutory enactments and judicial decisions in this arena. This concept was implicitly recognized in *Troxel* when the court emphasized there was no allegation that the mother was unfit and that "there is a presumption that fit parents act in *the best interests of their children*." (*Troxel, supra*, 530 U.S. at p. 68, italics added.) The state's legitimate interest in the welfare of children has given rise to numerous statutes in a broad array of contexts that seek to ensure a child's well-being while also protecting the liberty interests of parents to raise their children without undue interference by the state or third parties.

---

9    The biological father in *Troxel* was deceased. (*Troxel, supra*, 530 U.S. at p. 60.)

16

Relevant here, California statutes have long provided for the use of an evidentiary mechanism—i.e., a presumption—to assist with the determination of parentage when disputes arise concerning the rights and obligations of those charged with, or seeking to be involved in, a parental relationship with a child.  The parentage presumption set forth in section 7611(d) of California's Uniform Parentage Act (§ 7600 et seq.) is one of these statutes.  Under this statutory provision, a person is presumed to be the natural parent of a child if he or she "receives the child into his or her home and openly holds out the child as his or her natural child."  (§ 7611(d).)[10]  The California Supreme Court has concluded that the presumption may be used even though the person is not the *biological* parent of the child, stating that the " '[parentage] presumptions are driven, not by biological [parentage], but by the state's interest in the welfare of the child and the integrity of the family.  [Citation.]' "  (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 121-122 (*Elisa B.*); *In re Nicholas H.* (2002) 28 Cal.4th 56, 58-59, 63 (*Nicholas H.*).)  The parentage presumption is derived from the " 'strong social policy in favor of preserving [an] ongoing [parent] and child relationship . . . .' "  (*Nicholas H., supra*, at p. 66.)  The presumption is based on the state's interest in " 'preserving the integrity of the family and legitimate concern for the welfare of the child.  The state has an " 'interest in *preserving and protecting developed parent-child . . . relationships which give young children social*

___

10    At the time of trial in 2013, section 7611(d) addressed only presumed fathers, but effective January 2014 the statute was amended to be gender neutral by referring to presumed parents.  (29G, pt. 1, West's Ann. Fam. Code (2015 supp.) § 7611, p. 11.) Because use of the gender-neutral language does not create a substantive change, we use this language.

*and emotional strength and stability.*' "... [¶] ' " ' "... A [parent] who has lived with a child, treating [the child] as his [or her] son or daughter, has developed a relationship with the child that should not be lightly dissolved." ' " ' " (*Id.* at p. 65, italics added.)

In *S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023 (*S.Y.*), the court applied the section 7611(d) parentage presumption in a case where one of the parents (the adoptive mother) did not want her former same-sex partner (S.Y.) to have any parenting rights after their relationship ended. Affirming the lower court's finding that S.Y. was entitled to presumed parent status, the appellate court held that regardless of whether the adoptive mother *intended* that S.Y. obtain parental status, the presumed parent finding was appropriate because the adoptive mother "*allowed and encouraged S.Y. to function as the children's second parent* from birth, and S.Y. openly embraced the rights and obligations of being a parent." (*Id.* at pp. 1026, 1035, italics added.)

The *S.Y.* court also rejected the adoptive mother's claim that declaring S.Y. to be a presumed parent infringed upon her constitutional right to make decisions concerning the care, custody, and control of her children. (*S.Y., supra*, 201 Cal.App.4th at pp. 1026, 1037.) The court reasoned there was no constitutional infringement because, unlike the question of *grandparent* visitation addressed in *Troxel*, declaring S.Y. to be a parent did not extend rights to a *nonparent*. (*Id.* at p. 1037.) Likewise, *Charisma R., supra*, 175 Cal.App.4th 361, rejected a biological mother's constitutional challenge to application of the parentage presumption to her former same-sex partner, reasoning: "[Biological mother's] claim is essentially that as the biological mother, and in the effective absence of a biological father, she has a fundamental right to decide whether [the child] has a second

18

parent.  However, she presents no authority or reasoned argument that a state infringes on a biological parent's substantive due process rights by extending parental status to a nonbiological parent in the circumstances of this case."  (*Id*. at p. 388.)

B.  *Standards and Principles Relevant to the Section 7611(d) Parentage Presumption*

The section 7611(d) parentage presumption does not arise until certain evidentiary standards are met, and even when the presumption is found to exist, it is subject to rebuttal in appropriate cases.  A person who claims entitlement to presumed parent status has the burden of establishing by a preponderance of the evidence the facts supporting the entitlement.  (*S.Y., supra*, 201 Cal.App.4th at p. 1031; *In re Spencer W*. (1996) 48 Cal.App.4th 1647, 1653.)  When determining whether the person has met the statutory requirements of receiving the child into his or her home and openly holding the child out as his or her own, the court may consider a wide variety of factors, including the person's provision of physical and/or financial support for the child, efforts to place the person's name on the birth certificate, efforts to seek legal custody, and the breadth and unequivocal nature of the person's acknowledgement of the child as his or her own.  (See *S.Y., supra*, at p. 1034, fn. 10.)  No single factor is determinative; rather, the court may consider all the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home.  (See *ibid.*; *Charisma R., supra*, 175 Cal.App.4th at p. 376; see also *Nicholas H., supra*, 28 Cal.4th at pp. 60-61, fn. 2.)

The parentage presumption "is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing

19

evidence." (§ 7612, subd. (a).) This rebuttal provision " 'seeks to protect presumptions of [parental status], once they have arisen, from being set aside except upon clear and convincing evidence and only in an appropriate case.' " (*Nicholas H., supra*, 28 Cal.4th at p. 66.) Thus, a party disputing a presumed parent finding has the burden to rebut the presumption by clear and convincing evidence. (*S.Y., supra*, 201 Cal.App.4th at p. 1036.)

Consistent with the principle that presumed parent status may be afforded to a person who is not the biological parent, a lack of biological parentage does not alone require that the presumption be deemed rebutted. (*Nicholas H., supra*, 28 Cal.4th at pp. 58-59, 62-63; *Elisa B., supra*, 37 Cal.4th at pp. 122, 125; *In re Jesusa V*. (2004) 32 Cal.4th 588, 603-604, 606-607.) Rather, the court should evaluate all the circumstances to see if it is fitting for the presumption to be rebutted in the particular case. (*In re Jesusa V., supra*, at p. 606; *In re T.R*. (2005) 132 Cal.App.4th 1202, 1212.)

Relevant to the application of the section 7611(d) parentage presumption in cases where it will permit the child to have two parents, the courts have recognized "the value of having two parents, rather than one, as a source of both emotional and financial support . . . ." (*Elisa B., supra*, 37 Cal.4th at p. 123; *L.M. v. M.G.* (2012) 208 Cal.App.4th 133, 145-147 (*L.M.*); *Charisma R., supra*, 175 Cal.App.4th at p. 374; see *Kristine H. v. Lisa R*. (2005) 37 Cal.4th 156, 166 [court's decision guided by "public policy favoring that a child have two parents rather than one"].) However, the trial court's consideration of the two parent policy arises only *after* there is an evidentiary showing that the presumed parent statutory requirements have been met; that is, the two parent policy should not be used to *establish* the presumption but rather may be

20

considered on the issue of *rebuttal* of the presumption. (*In re D.M.* (2012) 210 Cal.App.4th 541, 554-555.) As explained in *D.M.*, "*The interest in providing a child with two parents is not a factor unless the evidence supports the presumption of parenthood.* [¶] We recognize that one important policy concern is ensuring that children have two parents. Here, D.M.'s counsel supported [the] request for presumed father status for that reason. But reliance upon the policy favoring two parents is misplaced if it comes before an accurate finding of parenthood." (*Id.* at p. 554, some capitalization omitted.)

Thus, case authority reflects that judicial application of the section 7611(d) parentage presumption and the two parent policy does not seek to *impose* a two parent choice to the detriment of a single parent choice, but rather seeks to *further* a two parent familial arrangement that has *already been developed* in the parenting of the child. (See *Jason P. v. Danielle S.* (2014) 226 Cal.App.4th 167, 178-179 [recognizing mother's "right to be the sole parent" of child conceived through use of sperm donor, but holding that sperm donor may seek to establish presumed parentage if mother allows relationship between child and sperm donor to "rise to the level of presumed parent and child"].)

II. *Mother's Challenges Based on the Constitutionally Protected Right To Parent*

Mother argues she has a constitutional right to form a single parent family, and even though that right may not be absolute, it should be balanced against any interest in promoting two parent families. She requests we hold that the right to create and maintain a single parent family is constitutionally protected in the same manner as a two parent choice, and that any law restricting the single parent choice must be based on a compelling state interest, narrowly drawn, and use the least restrictive means possible.

21

To implement this elevated constitutional protection, she posits that the standard for establishing presumed parent status should be clear and convincing evidence, not preponderance of the evidence, and require a showing of detriment to the child if presumed parent status is not found.

Mother's constitutional claims are unavailing given that the policy underlying the section 7611(d) presumed parent presumption is *the protection of already developed parent-child relationships for purposes of providing stability to children*. When viewed through the lens of this core policy, the relevant inquiry is not whether a single parent choice should be afforded the same level of protection as a two parent arrangement, but rather whether a two parent relationship has *in fact* been developed with the child. In this latter circumstance, the interests of the child in maintaining the second parental relationship can properly take precedence over one parent's claimed desire to raise the child alone. Also, in this context the single parent choice is not afforded less constitutional protection than the two parent choice; rather, it is the child's welfare that trumps the claimed single parent choice because a two parent family relationship has already been established for the child.

Further, as stated in *S.Y.*, finding a person to be a presumed parent does not equate with the interference with the right to parent at issue in *Troxel* because the latter involved the question of visitation by a *nonparent*. (*S.Y., supra*, 201 Cal.App.4th at p. 1037.) Presumed parent status is afforded only to a person with a *fully developed parental relationship* with the child; hence, the presumption adds to, but does not trample upon,

22

the constitutionally protected right to parent one's own child. (See *id.* at pp. 1026, 1037; *Charisma R., supra*, 175 Cal.App.4th at pp. 388-389.)

When raising her constitutional challenges, Mother asserts that there should be an "articulable distinction" between a presumed parent and other familial figures and caregivers, and criteria should be developed so that single parents do not have to avoid romantic entanglements or new marriages because of the risk of presumed parenthood. The presumed parent statute incorporates these distinctions and criteria. A person claiming presumed parent status under section 7611(d) will not prevail if he or she demonstrates only a caretaking role and/or romantic involvement with a child's parent. By its terms, the statute requires an assumption of responsibility for the child that rises to the level of receiving the child into the home, and a commitment to the child demonstrated by an open acknowledgement of the child as his or her own. (See *In re D.M., supra*, 210 Cal.App.4th at p. 544 [man claiming presumed father status must demonstrate "existing familial bond with the child sufficient to warrant giving him rights equal to those afforded a biological mother"].)

For example, the courts have rejected application of section 7611(d) presumed parent status to a grandmother who assumed a parental role but never claimed the child as her own. (*In re Bryan D.* (2011) 199 Cal.App.4th 127, 139-140.) In *In re Spencer W.*, the court found presumed parent status did not apply to a man who lived with the mother under circumstances indicating he did so for his own convenience and self-interest rather than as a demonstration of his commitment to the child. (*In re Spencer W., supra*, 48 Cal.App.4th at p. 1653.) In *In re D.M.*, the court concluded a man could not be declared

23

a presumed parent because although he visited with the child at another person's home, he never took the child into his own home.  (*In re D.M., supra*, 210 Cal.App.4th at pp. 549-550.)

Application of the section 7611(d) parentage presumption does not mean a single parent cannot maintain that choice without interference by a nonparent; rather, by its very nature the presumption will arise only if the single parent allows the circumstances to evolve to a point where the person is holding out the child as his or her own and receiving the child into his or her home for purposes of parental caretaking.  As recently stated in *Jason P. v. Danielle S., supra*, 226 Cal.App.4th 167, which concerned a sperm donor's request for presumed parent status:  "Our holding that a sperm donor is not precluded from establishing presumed parentage does not mean that a mother who conceives through assisted reproduction and allows the sperm donor to have some kind of relationship with the child necessarily loses her right to be the sole parent.  [¶]  First, section 7611 requires a *familial* relationship.  To qualify as a presumed parent under subdivision (d), the presumed parent must show that he or she 'receives the child into his or her home and openly holds out the child as his or her natural child.'. . .  A mother wishing to retain her *sole* right to parent her child conceived through assisted reproduction can limit the kind of contact she allows the sperm donor to have with her child to ensure that the relationship does not rise to the level of presumed parent and child.  [¶]  Second, the presumption of parentage under section 7611 is, with certain exceptions, a *rebuttable* presumption. . . .  Thus, even if a sperm donor can establish that he received the child into his home and openly held out the child as his natural child, the

24

trial court nevertheless may conclude based on other evidence that the presumption has been rebutted and the sperm donor is not the child's natural father." (*Id*. at pp. 178-179, fn. omitted.)

Thus, the presumed parent statutory scheme, which imposes strict holding-out and receiving-into-the-home standards and allows rebuttal of the presumption in appropriate cases, incorporates mechanisms to ensure that a parent who makes a decision to be a single parent will not subsequently be required to share that parenting with another person *unless* the court is satisfied the parent permitted the person to engage with the child at a level that transforms the interaction into a full, openly acknowledged two parent relationship.

We decline Mother's request that we elevate the single parent choice to a constitutional stature that would alter the presumed parent principles developed by the Legislature and courts, including the preponderance of the evidence standard required to establish the presumption. This area of the law involves the balancing of multiple interests, including the child's welfare and the rights and obligations of parental figures in a wide variety of contexts. The section 7611(d) parentage presumption focuses on the legitimate state interest in protecting a developed parent-child relationship that promotes the child's need for stability, and application of the presumption requires an evidentiary showing that is sufficiently stringent to protect the rights of a single parent such as Mother from unwarranted intrusion into her right to parent her child without interference. Absent a legislative determination to the contrary, there is no basis for us to alter the standards currently developed for application of the presumption.

25

III. *Mother's Challenges Based on Trial Court's Understanding*

*and Application of the Law*

Mother asserts that when making its rulings, the trial court misconstrued the law to favor two parent families; it gave little or no weight to her constitutionally protected right to form and maintain a single parent family and instead "curtly dismissed her constitutional claims without careful analysis"; and it erroneously ruled she did not have the right to rebut the parentage presumption because no other person was requesting presumed parent status.

We agree there is no rule precluding rebuttal of the presumption in all cases where only one person is seeking presumed parent status. Although the courts have recognized that rebuttal may be inappropriate in a particular case, including when there is no other person requesting presumed parent status, the courts have not established a broad rule precluding rebuttal as a matter of law in every case involving this circumstance.

For example, in *Nicholas H.*, the court held that in a case where no other person was seeking to be recognized as the child's father and the person had fully and willingly assumed a parental role, the trial court properly declined to find the presumption necessarily rebutted merely because the presumed father was not the biological father. (*Nicholas H., supra*, 28 Cal.4th at pp. 58-59, 63.) In *L.M., supra*, 208 Cal.App.4th 133 (the case cited by the trial court here), this court recognized the two parent policy and held that the trial court properly found rebuttal inappropriate in a case showing a "same-sex couple who decided together to bring the Child into their family to jointly raise him, and no other person is competing for the position of the child's second parent." (*Id*. at p.

26

145.) However, we also noted that the determination of whether it is appropriate to rebut a parentage presumption in a particular case is generally a matter of the trial court's discretion and the determination "depends on the unique facts of each case . . . ." (*Id.* at p. 145, fns. 9 & 10.)

These decisions reflect that Mother cannot rebut the presumption solely because RM is not Child's biological father and that the lack of a second parent is a relevant consideration on the rebuttal issue. But they do not establish a rule that rebuttal of the presumption is necessarily precluded in all cases where only one person is seeking presumed parent status. To the extent the trial court ascertained that the presumption was unrebuttable in this case as a matter of law, this was incorrect.

However, the court's statement that it did not view rebuttal as permissible in this case caused no prejudice to Mother because the court acceded to RM's request to assume the presumption was rebuttable and to make appropriate findings. The court found that Mother had not rebutted RM's presumed parent status for the same reasons that established the existence of the presumption, and (as we shall discuss below) the record supports this finding.

We also reject Mother's claim that when deciding whether the presumption had been established or rebutted, the trial court focused unduly on the two parent policy and failed to give adequate weight and consideration to her right to form and maintain a single parent family. In its written statement of decision, the trial court stated its understanding that Mother was motivated to be a single parent and had expended substantial resources to achieve this result; reviewed numerous factors relevant to

27

determine if RM had shown presumed father status; acknowledged Mother's constitutional argument; and when rejecting that argument cited a case (*S.Y., supra*, 201 Cal.App.4th 1023) that squarely rejected a claim of constitutional infringement. This reasoning shows the court was cognizant of Mother's single parent choice and her constitutional claim, and that its rejection of these claims was premised on a finding that RM had a fully developed parental relationship with Child.

Further, there is nothing to suggest that the court applied the two parent policy to lighten RM's burden to show his parental relationship. To the contrary, when the court referred to a policy in favor of providing a child with two parents, this was in the context of discussing whether the parentage presumption was legally rebuttable in this case, not whether RM had carried his burden to establish his presumed parent status. To the extent the court may have considered the two parent policy on the rebuttal issue, this would not have improperly undermined Mother's single parent rights because at this juncture the court had already found that RM had shown Child was in fact being parented by two parents with Mother's support.

IV.  *Sufficiency of the Evidence*

To the extent Mother challenges the sufficiency of the evidence to support the court's presumed parent finding (see fn. 2, *ante*), the record supports the court's decision.

On appeal, we review a trial court's finding of presumed parent status under the substantial evidence standard.  (*S.Y., supra*, 201 Cal.App.4th at p. 1031; *In re T.R., supra*, 132 Cal.App.4th at p. 1212.)  We view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in

28

support of the judgment. (*S.Y., supra*, at p. 1031.) We defer to the trial court's credibility resolutions and do not reweigh the evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) If there is substantial evidence to support the ruling, it will not be disturbed on appeal even if the record can also support a different ruling. (*Ibid.*)

The record shows that RM was at the hospital in San Diego assisting Mother when Child was born; two or three months after the birth, Mother flew with Child to be with RM at his home in Louisiana; and Mother continued to travel with Child to his home on a regular basis for the next two years of Child's life. During these visits, Mother and Child stayed with RM for weeks or months at a time; a room in RM's house was dedicated to Child; RM, Mother, and Child participated in numerous family events and recreational outings; and they attended church together as a family unit. Mother acknowledged that she called RM "Daddy" in Child's presence; she repeatedly gave RM cards and other items that referred to him as "Dad" or "Daddy"; and she identified RM as Child's father when she enrolled Child in a church program. RM's testimony that he and Mother openly referred to Child as RM's daughter was corroborated by RM's brother, pastor, and neighbor, and RM named Child as his beneficiary on an employment-related life insurance policy.

Considering all this evidence together, the record amply supports that RM received Child into his Louisiana home on a regular basis to provide her paternal love and care, and that RM, Mother, Child, and the community at large in Louisiana all perceived the relationship between RM and Child as a father-daughter relationship. Also, the fact that Mother gave birth to RM's biological child when Child was two years old

29

buttresses a finding that the parties' relationship had evolved to a point that they were a family unit consisting of a mother and father, and that Mother was not simply dating RM with no parental connection between RM and Child.

Mother cites numerous evidentiary items that could support a contrary conclusion, including, for example, that Mother was committed to being a single parent and underwent substantial efforts to achieve this result with Child; RM did not participate in the artificial insemination process; RM did not sign a declaration of paternity for Child at the hospital; RM was not named as Child's father on the birth certificate, birth announcement or baptism certificate; and RM and Mother each maintained their own homes in separate states. None of these factors required the trial court to reject RM's showing that he was Child's presumed father as supported by the evidence. The trial court could reasonably assess Mother may have initially intended to raise Child as a single parent, but during the first two years of Child's life Mother's relationship with RM developed such that RM, with Mother's full support, undertook a parental role and established a parent-child relationship with Child.

For the same reasons, Mother has not shown the trial court was required to conclude that she rebutted RM's presumed parent status by clear and convincing evidence.

DISPOSITION

The judgment is affirmed.  Appellant to pay respondent's costs on appeal.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McINTYRE, J.