Filed 3/22/16  In re Z.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re Z.M., a Person Coming Under the Juvenile Court Law. | D069110 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519203) |
| v. | |
| KAYLA M. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant Kayla M.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant Walter G.

Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Walter G., the biological father of minor Z.M., appeals the juvenile court's determination that he was not Z.M.'s presumed father under Family Code[1] section 7611, subdivision (d), and that Cameron V. was Z.M.'s presumed father. Kayla M., Z.M.'s mother, appeals the juvenile court's dispositional order placing Z.M. with Cameron's mother, Loretta V. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a complex relationship between Kayla and two men. Kayla was in a relationship with Walter and nine months pregnant with Z.M. when, in February 2015, Walter was arrested for striking her in the face. While Walter was incarcerated, Kayla resumed her relationship with Cameron, with whom she had two other children. Cameron had custody of their two children pursuant to a prior family court order. After Kayla and Cameron reunited, Cameron drove Kayla to a prenatal appointment, took her to the hospital for Z.M.'s birth, and stayed at the hospital for three days after her delivery. Cameron signed Z.M.'s birth certificate and a paternity declaration, despite knowing Z.M. was not his biological child.

Kayla and Z.M. lived with Kayla's grandparents for a week or two. Thereafter, they moved in with Cameron and his two children at Loretta's house. In mid-April, Walter was released from custody. Kayla and Z.M. moved out of Loretta's house, and

---

[1] Further statutory references are to the Family Code unless otherwise specified.

2

Kayla resumed her relationship with Walter, despite a restraining order in place. Between April and June, Kayla and Z.M. spent a few nights per week at a motel with Walter, who was homeless; they spent the remainder of their time living with Z.M.'s maternal great-grandparents.

In May, Walter punched Kayla in the face while Z.M. was present. Kayla believed Walter's domestic violence was connected to his drug use and agreed to a safety plan by the San Diego County Health and Human Services Agency (the Agency), but she did not comply with its terms. In June, the Agency filed a dependency petition. (Welf. & Inst. Code, § 300, subd. (b).) At the detention hearing, the juvenile court found the Agency had made a prima facie showing that Z.M. was in need of protection and ordered Z.M. placed in foster care. Walter and Cameron both requested presumed father status, but the court deferred the matter for a contested paternity hearing.

At the contested paternity hearing in July, the court determined Walter did not qualify as a presumed father. Although genetic testing confirmed he was Z.M.'s biological father, the court found he had not received Z.M. into his home or sufficiently provided for Z.M. to support a presumption of fatherhood under section 7611, subdivision (d).[2] By contrast, the court determined Cameron did qualify as a presumed father, based on evidence he received Z.M. into the home he shared with Loretta,

---

[2]    Section 7611, subdivision (d), creates a rebuttable parentage presumption if "[t]he presumed parent receives the child into his or her home and openly holds out the child as his or her natural child."

provided for Z.M., and held out Z.M. as his child.[3]  The court noted Kayla's concerns about Cameron's controlling behavior, but it found Cameron to be credible and issued a judgment of paternity in his favor.  The court ordered visitation and services for Cameron, Kayla, and Walter and granted the Agency discretion to detain Z.M. with Cameron.

Following a team decision meeting in late July, the Agency placed Z.M. with Cameron at Loretta's house.  When the social worker visited the home, Z.M. seemed bonded with his half siblings, and the home appeared well kept.  Kayla, Cameron, and Walter submitted to the court's jurisdiction and, in August, the court found the allegations in the Agency's dependency petition true by clear and convincing evidence.

In September, Loretta told the social worker that Cameron did not spend nights in her home, did not take care of Z.M., and was using Z.M. to control Kayla.  Loretta said Z.M. became ill after Cameron took him outside one night against her wishes; Loretta told the social worker she wanted Z.M. placed with her to prevent future disruption. Cameron admitted to the social worker that he had not seen Z.M. in three days.  When asked why he had canceled one of Walter's visits, Cameron said, "fuck Walter."  The Agency held another team decision meeting to discuss visitation and placement, after which Cameron unilaterally changed the schedule and cancelled a visit with Z.M.'s maternal great-grandparents.  Kayla objected to placing Z.M. with Loretta, telling the

---

3    The court did not rely on Cameron's voluntary declaration of paternity because Kayla knew at Z.M.'s birth that Cameron was not the biological father.

4

social worker Loretta smoked inside her home and Cameron did not live there full time. Kayla wanted the court to expand her visitation and place Z.M. with his maternal great-grandparents.

At the contested disposition hearing in October, the court heard testimony from social worker Helen Solivan and received the Agency's reports into evidence. The Agency recommended Z.M. be placed with Loretta, who agreed to facilitate visits. Solivan expressed no concerns that the maternal great-grandparents would also take excellent care of Z.M., but she testified Z.M. was closely bonded to his half siblings, favoring placement with Loretta. The Agency took Kayla's concerns about Loretta's smoking seriously but believed it could work with Loretta to resolve the issue.

The juvenile court adopted the Agency's recommendations. Determining Z.M. would face detriment if placed with Kayla or Cameron, it placed Z.M. with Loretta. The court found Loretta was able to regulate Z.M.'s visitation and rejected concerns that Cameron would exert control to limit Kayla's contact with Z.M. Finding Z.M. to be bonded with his half siblings, the court determined he would be better served in Loretta's care should Kayla not reunify with Z.M. The court conditioned Z.M.'s placement on Loretta facilitating overnight visits with the maternal great-grandparents and not smoking in the house, and it gave the Agency discretion to move Z.M. to the home of another relative or nonrelated extended family member. The court ordered visitation and services

for Kayla, Cameron, and Walter and ordered Cameron to enroll in an anger management program. Walter and Kayla timely appealed.[4]

DISCUSSION

Walter challenges the juvenile court's presumed fatherhood determinations under Family Code section 7611, subdivision (d), and Kayla challenges the court's placement of Z.M. with Loretta under Welfare and Institutions Code section 361.3.[5] We conclude substantial evidence supports the juvenile court's presumed fatherhood determinations, and the court did not abuse its discretion in placing Z.M. with Loretta.

I. *Presumed Fatherhood Determinations*

A. *Legal Principles*

California's Uniform Parentage Act (§ 7600 et seq.) distinguishes presumed fathers from "alleged" and "biological" fathers. (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018; *In re T.R.* (2005) 132 Cal.App.4th 1202, 1208 (*T.R.*).) "Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 (*Jerry P.*); see *In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449.) A presumed father is a person who " 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]' " (*Jerry P.,* at pp. 801-802,

---

4    The dispositional order is an appealable judgment pursuant to Welfare and Institutions Code section 395. (*In re S.B.* (2009) 46 Cal.4th 529, 531-532.)

5    Kayla also joins Walter's argument insofar as a reversal of Cameron's presumed fatherhood determination under section 7611 would invalidate Z.M.'s placement with Loretta. Z.M.'s trial counsel joins the Agency's position that the parentage and placement decisions should be affirmed.

6

quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849.) A presumed father must have demonstrated a commitment to the child and the child's welfare; biology is not determinative. (*T.R.,* at pp. 1211-1212.)

Section 7611 sets forth a number of rebuttable parentage presumptions. The statute aims " 'to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' " (*T.R., supra,* 132 Cal.App.4th at p. 1209.) Relevant here, section 7611, subdivision (d), confers presumed parentage on a father who "receives the child into [his] home and openly holds out the child as [his] natural child." A person seeking presumed father status under this provision bears the initial burden of establishing by a preponderance of the evidence that he physically brought the minor into his home and openly and publicly acknowledged paternity. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652.)

In evaluating whether a person qualifies as a presumed father, "courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*T.R., supra,* 132 Cal.App.4th at p. 1211.) No single factor is dispositive; courts consider

7

all circumstances to determine whether a person has demonstrated a parental relationship and assumed responsibility for the child. (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774 (*R.M*).)

We review the juvenile court's presumed parentage determinations for substantial evidence. (*In re A.A.* (2003) 114 Cal.App.4th 771, 782 (*A.A.*); *R.M., supra,* 233 Cal.App.4th at p. 780.) We do not reweigh the evidence or disturb the juvenile court's credibility determinations; instead, we draw all reasonable inferences and resolve conflicts in the evidence in favor of the court's findings. (*R.M.*, at p. 780.)

B. *Analysis*

Substantial evidence supports the juvenile court's determination that Walter did not qualify as Z.M.'s presumed father. Walter was incarcerated at the time of Z.M.'s birth. After he was released, he was homeless and reliant on welfare. Z.M. stayed with Walter in motel rooms three to four days per week between April and June 2015. On one of these occasions, Walter invited friends to stay in the room. Walter sometimes paid for the rooms using welfare funds; other times his mother, his friend, Kayla, or Kayla's boss paid for the room. Walter's unemployment, homelessness, and reliance on others to pay for motel rooms suggest his intermittent residence with Z.M. was based on self-interest, not a commitment to Z.M. (*In re Spencer W., supra,* 48 Cal.App.4th at p. 1653 [alleged father's brief residence with minor "reflected that [he] acted out of personal convenience and self-interest" and not commitment to the child]; *Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 374 ["receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the

8

relationship"], disapproved on other grounds by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7.)  There is substantial evidence to support the trial court's finding that Walter did not take Z.M. into *his* home, as the statute requires.  (§ 7611, subd. (d).)

Moreover, Walter did not demonstrate " 'a full commitment to his parental responsibilities—emotional, financial, and otherwise[.]' "  (*Jerry P., supra,* 95 Cal.App.4th at pp. 801-802.)  Walter had a history of drug use and domestic violence; his violent altercation with Kayla led to the instant dependency case.  (*T.R., supra,* 132 Cal.App.4th at p. 1211 [presumption not met where alleged father's actions were "inimical to [the child's] welfare and well-being"].)  Despite knowing Z.M. was his biological child, there is no evidence Walter sought to put his name on Z.M.'s birth certificate or take legal action to establish paternity.  (*In re Spencer W., supra,* 48 Cal.App.4th at p. 1654 [alleged father "failed to take formal steps to place his name on the birth certificate, to establish paternity by legal action, or to assume the financial obligations for child support"].)  Walter did not provide for Z.M. financially; he bought clothes, diapers, and wipes on just two occasions and never bought formula for Z.M.  (*A.A., supra,* 114 Cal.App.4th at p. 786 [biological father who failed to show he financially supported the minor not a presumed father].)  There is substantial evidence Walter's care of Z.M. was merely incidental and did not rise to the level of presumed fatherhood.  (*T.R.,* at p. 1211 [courts evaluate if "care was merely incidental"]; *In re D.M.* (2012) 210 Cal.App.4th 541, 553 [a presumed father must demonstrate " 'an abiding commitment to the child and the child's well-being' "].)

9

Substantial evidence also supports the juvenile court's determination that Cameron was Z.M.'s presumed father. Cameron was employed, having worked for the same company for three years for roughly 30 hours per week. He lived with Loretta and received his mail there. Although he did not pay rent, he had an arrangement with Loretta to cover food and household expenses. Cameron had custody of Z.M.'s two half siblings, who lived with him at Loretta's house. Critically, Cameron sought involvement with Z.M. from the start. He drove Kayla to a prenatal checkup, was present for Z.M.'s birth, placed his name on Z.M.'s birth certificate, stayed with Kayla and Z.M. at the hospital for three days, visited Z.M. at his maternal great-grandparents' home after leaving the hospital, bought food while Z.M. remained with the great-grandparents, and shared his home with Z.M. until Kayla moved out and resumed her relationship with Walter.

Despite knowing Z.M. was not his biological child, Cameron "was involved with the minor from the very beginning, with Mother's blessing." (*A.A., supra,* 114 Cal.App.4th at p. 784.) He told others he was Z.M.'s father, and he felt emotionally attached to Z.M. Cameron provided for Z.M. financially, buying a car seat, stroller, clothing, and "every single thing that [Z.M.] had." (*Ibid.* [presumed father "provided financially for the minor's needs, buying her clothes, toys and food, and other essentials"].) The court found Cameron to be the one stepping up to provide a stable parental relationship for Z.M.

Walter argues Cameron inserted himself in Z.M.'s life in order to control Kayla's access to her two other children. Although the court expressed concern about Cameron's

control issues, it found Cameron's testimony about his actions for Z.M. credible. We do not reweigh evidence or disturb the juvenile court's credibility determinations on appeal. (*R.M., supra,* 233 Cal.App.4th at p. 780; *A.A., supra,* 114 Cal.App.4th at p. 782.) We also do not consider evidence that emerged *after* the contested paternity hearing, such as evidence that Cameron did not live with Loretta full time.[6]

## II. *Z.M.'s Placement with Loretta*

### A. *Legal Principles*

At a dispositional hearing, if a child is removed from parental custody (Welf. & Inst. Code, § 361, subd. (c)), the court must place the child with a caretaker who will accommodate the child's needs while cooperating with reunification efforts. (*In re Joseph T., Jr.* (2008) 163 Cal.App.4th 787, 798; *In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493.) If the court cannot place the child with a noncustodial parent (Welf. & Inst. Code, § 361.2. subd. (a)), it must consider whether to place the child with a relative (*id.*, § 361.3). Relatives are given preferential consideration for placement, whenever possible. (*Id.*, subds. (a) & (c)(1); *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1055; *In re R.T.* (2015) 232 Cal.App.4th 1284, 1296.) The statutory preference reflects California's strong public policy favoring reunification; relatives are considered

---

6 Because Walter did not qualify as a presumed father, we do not address his argument that his parentage claim is "founded on the weightier considerations of policy and logic" under section 7612, subdivision (b).

11

more supportive of family unity and less likely to compete with a child's parents for permanent placement. (*In re Joseph T., Jr., supra,* at pp. 797-798.)[7]

In determining whether to place a child with a relative, courts consider the child's emotional needs; the location of the child's half siblings; and the relative's ability to provide a safe and stable living environment, properly care for and protect the child, facilitate court-ordered reunification efforts and visits, facilitate implementation of the case plan, and provide legal permanence if reunification fails. (Welf. & Inst. Code, § 361.3, subd. (a).) During the reunification period, the juvenile court must ensure that placing the child with a relative does not prevent visitation or reunification. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 681.) Nevertheless, the child's best interest is the linchpin of the analysis. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1068; *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1112.)

We review placement determinations for abuse of discretion and do not disturb a juvenile court's ruling absent a manifest showing of abuse. (*In re Alicia B.* (2004) 116 Cal.App.4th 856, 863.) We give broad deference to the juvenile court and interfere only if we find that under all the evidence, viewed most favorably in support of the ruling, no judge reasonably could have made the same placement determination. (*In re Robert L., supra,* 21 Cal.App.4th at p. 1067.)

---

7    Only an adult grandparent, aunt, uncle, or sibling may be given preferential consideration for placement. (Welf. & Inst. Code, § 361.3, subd. (c)(2).) As Z.M.'s paternal grandmother, Loretta qualified for preferential relative consideration, whereas Z.M.'s maternal great-grandparents did not. (*Ibid.*; *In re Baby Girl D., supra,* 208 Cal.App.3d at p. 1494 [child's great-aunt not a "relative" entitled to preferential consideration].)

12

B. *Analysis*

The juvenile court determined Loretta and the maternal great-grandparents would both provide Z.M. with excellent care. However, the court favored placement with Loretta to facilitate interaction between Z.M. and his half siblings, with whom Z.M. was closely bonded. This was within the juvenile court's discretion; courts must consider if siblings and half siblings can be placed in the same home, unless such placement would be contrary to the safety and well-being of any of the siblings. (Welf. & Inst. Code, § 361.3, subd. (a)(4).)

Moreover, placement with Loretta served the dual goals of providing for Z.M.'s welfare and facilitating parental reunification. The social worker found Loretta's home to be "spotless" and furnished with items necessary for Z.M.'s care. (Welf. & Inst. Code, § 361.3, subd. (a)(7)(C).) Loretta worked as a nurse and provided a safe and stable living environment for Z.M. and his half siblings. (*Id.*, subd. (a)(7)(A) & (8).) Loretta cared for and loved Z.M. in the same manner as her biological grandchildren. (*Id.*, subd. (a)(1).) At the time of the October disposition hearing, Z.M. had lived with Loretta for four months, or half his life. (*Id.*, subd. (a)(6).) Loretta had been cooperative with visitation, and the social worker expressed no concerns about Z.M. attending services or appointments if he remained in Loretta's care. (*Id.*, subd. (a)(7)(E) & (F).)

Kayla argues placing Z.M. with Loretta was an abuse of discretion because Loretta smoked in the home, whereas there was no evidence the maternal great-grandparents did. The Agency visited Loretta's home in July and detected no sign of smoking. In August, Z.M.'s backpack and diapers smelled of cigarette smoke, and the Agency instructed

13

Loretta not to smoke inside her home. The day before the disposition hearing, Kayla told the social worker Loretta had recently smoked in her home, but there was no *evidence* at the hearing to support that allegation. Further, the Agency believed it could work with Loretta to resolve the issue. If Loretta smoked in her home, the Agency would find an alternate placement for Z.M. The juvenile court accepted the social worker's testimony and conditioned Z.M.'s placement on Loretta not smoking in her home. "Our job is not to reweigh the evidence. The juvenile court, sitting as trier of fact, heard the witnesses testifying and was in a better position than we are to adjudge their testimony." (*In re Alicia B., supra*, 116 Cal.App.4th at p. 864.) Kayla's unsupported allegation about Loretta's recent smoking does not indicate an abuse of discretion.

Kayla also argues placing Z.M. with Loretta would prevent Kayla and Z.M. from reunifying, given uncontroverted evidence of Cameron's controlling behavior. The juvenile court expressed concern regarding Cameron's control and anger issues but did not believe he would control Loretta to limit Kayla's contact with Z.M. Kayla's concern that Cameron might obstruct reunification if Z.M. were placed with Loretta is speculative. (*In re Robert L, supra,* 21 Cal.App.4th at p. 1068 [concern that grandparents would obstruct reunification "wholly speculative" where record instead showed they had been " 'completely cooperative' "].) Z.M. was detained with Loretta between July and September. During that time, Cameron had not tried to manipulate or influence Loretta to limit Kayla's visits with Z.M. The social worker had no concerns about Loretta's ability to comply with Z.M.'s visits, reunification efforts, and appointments. Loretta and the maternal great-grandparents had worked out a visitation arrangement on their own

that appeared to work well: Z.M. spent three days per week with the great-grandparents and four days with Loretta. Because there was no evidence placement with Loretta would prevent visitation or reunification, the court was within its discretion in placing Z.M. with Loretta. (*Ibid.*; cf. *In re Luke L., supra,* 44 Cal.App.4th at p. 681 [placement with out-of-state relatives an abuse of discretion where there was evidence it would foreclose parent's visitation and reunification].)

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.

15