Filed 9/23/15  T.W. v. G.S. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| T.W., | B257777 |
| Defendant and Appellant, | (Los Angeles County Super. Ct. No. PF004541) |
| v. | |
| G.S., | |
| Plaintiff and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Michelle Williams Court, Judge.  Reversed.

Law Offices of Melissa Buchman, Melissa B. Buchman, for Defendant and Appellant.

Lipton and Margolin, Hugh A. Lipton and Brian Magruder for Plaintiff and Respondent.

The family law court issued restraining orders pursuant to Family Code section 3048,[1] a child abduction statute, that prohibits plaintiff and appellant T.W. (Mother) from removing her daughter from Los Angeles County absent either the consent of defendant and respondent G.S. (Father) or permission from the court. We consider whether sufficient evidence supports the predicate for the court's orders, namely, the finding there was a risk Mother would abduct her daughter, G.

## BACKGROUND

Mother and Father work for the Los Angeles County Sheriff's Department (the Department). Mother lives in Lancaster with G., and Father resides in Santa Clarita. At the time of G.'s birth, Mother and Father were no longer romantically involved. Since G.'s birth, Mother has been in a relationship with a man (now her fiancé) who lives in Tehachapi, a city roughly 50 miles northwest of Lancaster. Until the issuance of the orders that are the subject of this appeal, Mother and G. often spent time with her fiancé and his two children in Tehachapi attending family gatherings, birthday parties, and church services.

Court custody proceedings between Mother and Father began in 2009 when Father filed a paternity action and obtained custody and visitation orders permitting him to visit G. twice a week. In 2011, Mother filed an Order to Show Cause asking to move to Tehachapi with G. Initial custody proceedings, including an evidentiary hearing, ensued over the next two years and Mother put her plans to move on hold.

The family law court made its initial custody determination in December 2013, awarding Mother primary physical custody of G. and granting both parents joint legal custody. The court observed that discord between the parties had resulted in a high conflict parenting situation, that G.'s contact with Mother had been greater than G.'s contact with Father, but that G.'s contact with Father had been limited by Mother's actions. The court found that Mother had difficulty co-parenting with Father and had

---

[1] All undesignated references are to the Family Code.

2

made allegations against him the court found to be untrue. However, the court also recognized G.'s strong emotional bond with Mother and her stated intention to protect G. from harm. The court concluded: "It is not in [G.]'s best interest to divest Mother of significant parental rights and responsibilities at this time. Rather, the court has ordered a child custody evaluation for more information and insight into a more permanent custody and visitation plan." The court entered an order for the evaluation pursuant to section 3111, subdivision (a), and set a visitation schedule for the parties.

Shortly after the court's initial custody order, Mother informed Father that she had become engaged to the man she had been seeing and that she intended to relocate with G. to Tehachapi. Father disapproved and immediately moved ex parte for modification of the initial custody order, seeking sole legal and physical custody of G. and asking the court to enjoin Mother from moving G. to Tehachapi. Mother responded that she had the right to move as the primary custodial parent, and she contended her move would not interfere with Father's custodial rights because she would continue to work in Lancaster and G. would continue to attend therapy and childcare in Lancaster.

The court granted Father's request to enjoin Mother from moving G. outside Los Angeles County pending completion of the custody evaluation.[2] The court set the matter for a further hearing approximately five months later, in May 2014. In the weeks that followed, Mother took medical leave from the Department after suffering an injury. She also sold her home in Lancaster and purchased a home in Tehachapi with her fiancé. Mother and G., however, continued to live in Lancaster at Mother's parents' house pending further resolution of the ongoing custody proceedings.

On May 16, 2014, Father's attorneys received a copy of the court-ordered child custody evaluation report prepared by Susan Ralston, Ph.D. Five days later, on May 21, Father filed a declaration accompanied by a "Request for Order" Judicial Council form—without notice to Mother. Father's ex parte filing sought to reverse the existing custody

---

**2** This injunction did not prohibit Mother and G. from visiting Tehachapi. It only prevented Mother from changing G.'s residence to a home anywhere outside Los Angeles County.

3

order and to obtain sole legal and physical custody of G. pending further proceedings in the case. Notwithstanding a prior stipulation that Dr. Ralston's evaluation report would not be admitted into evidence unless she testified in court, Father's declaration quoted excerpts from Dr. Ralston's report to justify his request for custody.

Father also asked, in the event the court declined to modify the initial custody order, that the court restrain Mother from taking G. out of the County of Los Angeles at any time. In support of that request, Father submitted a Judicial Council form application for a child abduction prevention order pursuant to section 3048. Father checked boxes on the form to indicate that he thought Mother might take G. without his permission to another county in California (Kern County, where Tehachapi is located) or to another state (Texas). On the portion of the Judicial Council form that asked Father to explain his reasons for thinking Mother might take G. without his permission, he asserted (again, by checking the relevant boxes) that Mother had violated or threatened to violate a custody or visitation order in the past, that Mother had recently done things that made it easier to take G. away without permission, and that Mother had a history of not cooperating with him in parenting.

Except as to the assertion that Mother had recently done things that made it easier to take the children away, Father provided no additional information on the form to explain the three abduction factors he asserted were present. As to that factor where a brief explanation was provided, Father stated Mother was living temporarily in her mother's home and claimed Mother was on disability and had no intention to return to her job working for the Department.

Relying on Father's submission, the court entered a temporary emergency order preventing Mother from taking G. outside Los Angeles County and denied without prejudice all of Father's other requests relating to a change in custody. In its order, issued on Judicial Council Forms FL-305 and FL-341(B), the court found that there was a risk Mother would take G. without permission for the reasons asserted by Father: she had violated or threatened to violate a court order, her status on disability leave from her job and living temporarily with her mother were things that made it easy for her to take G.

4

away without permission,[3] and she had a history of not cooperating with Father in parenting. The court also set a hearing for further proceedings on the temporary emergency order.

Both Mother and Father subsequently appeared in court for further proceedings on the May 21 ex parte order. The court continued the matter to June 12, 2014, in order to consider Mother's request that the court recuse itself, a request that the court later denied.

Both parties filed documents in advance of the June 12, 2014, hearing date. Father submitted a declaration to "further detail the reasons [he] believe[d] that [Mother] is a flight risk with our daughter . . . which were set forth in [his] Request for Child Abduction Prevention Orders (FL-312)." Father's declaration asserted that Mother had failed to comply with a July 2010 court order obligating her to place Father's name on G.'s birth certificate. Father's declaration also summarized additional reasons on which he based his claim that G. might be abducted by Mother: "(1) The sale of her house, (2) Stating that she had no intention of returning to work for the Sherriff's Department, (3) [Mother's] fiancé . . . selling his house, (4) [G.] telling [Father] that her mother and [her fiancé] were moving with [G.] to Texas, and—most importantly—Dr. Ralston's analysis of our daughter's well-being while in [Mother's] custody . . . ." Father's declaration did acknowledge, however, that Mother had provided him with her fiancé's first Tehachapi address, and that after her fiancé had bought a new house, Mother had recently provided him with that address as well.

Mother filed a responsive declaration the day before the hearing. She directly addressed Father's assertion that she might move to Texas stating, "I have never been to Texas. I have no family in Texas. My fiancé has no family in Texas. I have no ties to Texas. The only connection my fiancé and I have with Texas is that my fiancé is a huge Dallas Cowboys football fan . . . [and] has shown [G.] his Dallas Cowboys

---

**3** Father's request for an order relied on Mother's sale of her home to support the assertion that she had done things that would make it easier to abduct G. The court did not rely on the sale of the home in support of its findings.

5

memorabilia. . . . During Dr. Ralston's custodial evaluation, Dr. Ralston asked both me and my fiancé if we planned to travel or move to Texas. I told Dr. Ralston that we have no intention of relocating. I explained to her that my family lives in Lancaster and my fiancé's two children . . . live in Southern California. I also told her my fiancé owns a home in Kern County and his immediate family resides in Kern County. Finally, my fiancé is a deputy sheriff in Los Angeles County." Mother also stated that she had never traveled with G. out of state and that she had not been on an airplane for over ten years.

In addition, Mother's declaration addressed other matters raised by Father in connection with his claim that she might abduct G. Mother stated that she informed Father that she had sold her home in an email sent to him on March 27, 2014—almost two months before Father sought the ex parte restraining order in May. Mother also stated that she and her fiancé had since purchased a new home together in Tehachapi (about a mile from his old home), but that she and G. would continue to live at her parents' home in Lancaster until she received permission from the court to move. Mother acknowledged that she was on medical leave from her job at the Department as the result of an injury she suffered through no fault of her own. She explained that she was still employed, but if her doctor did not clear her to return to duty she might be medically retired by her employer; in that event, she would need to find new employment and she had therefore enrolled in an online masters program to become a teacher. Finally, Mother asserted that her failure to add Father's name to G.'s birth certificate in response to a 2010 court order had no significance because she stipulated to Father's status as G.'s biological father, which permitted Father to add his name to G.'s birth certificate on his own.

At the June 12 hearing, after hearing from the parties, the court stated that unless the parties could agree to G.'s travel outside Los Angeles County, they would need to come to court to get an order. The court observed, "[s]o one of the things that no one's really talking about is the fact that when the court made the orders on the [May 21, 2014,] ex parte application, there was a pending move away request and the information that the court had was that Mother had already moved . . . ." The court stated that it was

6

"concerned about a de facto move away," and that "there is good cause, based on the entire history of this case and excluding anything that may or may not be in Dr. [Ralston's] report, to issue the temporary orders that were issued [on May 21, 2014,] so those orders will remain in full force and effect . . . ." The court also ruled it would not consider a change in custody, deferring that determination instead to the upcoming custody trial. Mother asked the court to issue a statement of decision and a stay of its restraining order; the court declined.

On July 21, 2014, Mother filed a timely notice of appeal pursuant to Code of Civil Procedure section 904.1, subdivision (a)(6) that challenges the court's order of May 21, 2014, as continued in effect by order of the court on June 12, 2014.

## DISCUSSION

The family law court issued its temporary ex parte order using the relevant Judicial Council forms and subsequently ordered, without issuing a statement of decision, the restraining order to remain in force. The court relied on section 3048 in issuing the orders and both parties identify and discuss a second potential basis for the orders: section 3064. Under either statute, we conclude insufficient evidence supports the orders. We therefore reverse.

## I

The parties agree that we review the challenged orders for abuse of discretion, a standard this court commonly applies when reviewing a trial court ruling that must account for and consider various statutory factors. (See, e.g., *Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1319-1320; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 479-480.) "'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 146, quoting

7

*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) Accordingly, a proper exercise of discretion must at a minimum be based upon factual findings that are supported by substantial evidence. (See *Dept. of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 (*Dept. of Parks*) ["[I]n the absence of any substantial evidence supporting its findings, the Board has no discretion to modify or revoke the discipline imposed by the appointing power"].)

"The substantial evidence rule measures the quantum of proof adduced at a hearing and assesses whether the matters at issue have been established by a solid, reasonable and credible showing." (*Dept. of Parks*, *supra*, 233 Cal.App.3d at p. 830.) A reviewing court draws all reasonable inferences in support of the findings, gives deference to any witness credibility determinations, and does not reweigh the evidence. (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780; *In re Matthew S*. (1988) 201 Cal.App.3d 315, 321.) But substantial evidence is not synonymous with any evidence. Rather, the evidence must be "'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.'" (*Dept. of Parks*, *supra*, 233 Cal.App.3d at p. 830; accord, *In re B.T.* (2011) 193 Cal.App.4th 685, 691; *In re James R., Jr.* (2009) 176 Cal.App.4th 129, 135.)


## II

The Synclair-Cannon Child Abduction Prevention Act of 2002 added section 3048 to the Family Code. Subdivision (b)(1) of the statute provides: "In cases in which the court becomes aware of facts which may indicate that there is a risk of abduction of a child, the court shall, either on its own motion or at the request of a party, determine whether measures are needed to prevent the abduction of the child by one parent. To make that determination, the court shall consider the risk of abduction of the child, obstacles to location, recovery, and return if the child is abducted, and potential harm to the child if he or she is abducted." To determine whether there exists a risk of abduction,

8

section 3048 states that a court "shall consider" eight factors specified in the statute.[4] (§ 3048, subd. (b)(1).)

Where a court finds a risk of abduction exists, section 3048 lists 11 possible preventative measures a court must consider taking. (§ 3048, subd. (b)(2).) These range from ordering supervised visitation to authorizing the assistance of law enforcement. As relevant here, the statute permits a court to restrict the right of a parent "to remove the child from the county, the state, or the country." (§ 3048, subd. (b)(2)(C).)

Mother urges us to find the court abused its discretion because it applied the wrong legal standard. She points to the court's comments at the June 12 hearing that it was "concerned about a de facto move-away" and that there was "good cause" to issue the temporary orders. While we believe the court's comments might generate some confusion, the May 21 order was issued via the Judicial Council form that specifies the relevant factors under section 3048, factors that the court necessarily considered in filling out the form. Because we presume the correctness of the family law court's orders (see *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563), we find the record shows the court knew of and applied the correct legal standard.

Nevertheless, the question remains whether sufficient evidence supports the issuance of the orders under section 3048. Father asserted there was a risk Mother would take G. without permission to another state, Texas, or to another county within this state, Kern County. The family law court relied on Father's evidentiary submission and concluded several section 3048 factors were present and established a risk of abduction. We therefore examine the evidence that ostensibly supports the relevant statutory factors.

---

[4] The statutory factors for consideration are whether a party (1) has previously taken or concealed a child in violation of the right of custody/visitation, or (2) threatened to do so; (3) lacks strong ties to California; (4) has "strong familial, emotional, or cultural ties to another state or country"; (5) has no financial reason to stay in California, including whether the party is unemployed, able to work anywhere or is financially independent; (6) has engaged in "planning activities that would facilitate the removal of a child from the state," including closing a bank account, selling her primary residence or applying for a passport among other considerations; (7) has a history of a lack of parental cooperation or child abuse; and (8) has a criminal record. (§ 3048, subd. (b)(1)(A)-(H).)

First, the court's May 21 order concluded that Mother engaged in "planning activities that would facilitate [] remov[ing] [G.] from the state . . . ."[5] (§ 3048, subd. (b)(1)(F).) Subdivision (b)(1)(F) lists potential indicia of such planning activity: closing a bank account, quitting a job, selling a primary residence, hiding or destroying documents, applying for a passport, purchasing airline tickets, liquidating other assets, or applying to obtain a birth certificate or school or medical records. The challenged court orders relied on none of the indicia listed in the statute itself. Instead, the court cited Mother's status on disability leave from her job and the fact that she was living temporarily with her mother.

It was undisputed, however, that Mother's medical leave was triggered by an on-the-job injury for which she was not at fault. Suffering an unexpected injury cannot fairly be characterized as "planning activity" by Mother to facilitate an abduction. Further, there was no dispute that Mother continued to be employed by the Department despite being unable to work, and Mother's declaration established that she had no intention of resigning from the Department unless she first secured a position as a teacher.

As for living temporarily with her mother, that is, if anything, evidence that Mother would *not* abscond with G. During the proceedings in this case, Mother notified either the court or Father about her desire to move with G. to Tehachapi before moving: Mother did so in 2011 when she first sought permission from the court to move, and she did so again in December 2013 when she informed Father that she had plans to move to her fiancé's home—which led to the order that same month barring her from moving with G. By the time of the court's temporary orders in May and June, Mother had sold her home and purchased a new one in Tehachapi with her fiancé; there is no doubt that she

---

**5**      The Judicial Council form that the court used to issue the May 21, 2014, restraining order approximates but does not exactly track the text of section 3048, subdivision (b)(1)(F). The form directs a court to check a box if it finds a parent "has done things that make it easy for him or her to take the children away without any permission . . . ." We analyze the issue by focusing on the language of the statute itself.

wanted to move with G. to that new home. But the circumstances demonstrate she continued to live temporarily in her parents' home in Lancaster not as a means of planning to take G. away without permission, but to comply with the court's December 2013 order that restrained her from relocating with G.

Moreover, subdivision (b)(1)(F) directs a court to consider whether there has been any planning activity that would facilitate removing a child "*from the state*." (Emphasis added.) Father's evidentiary showing, which served as the basis for the challenged court orders, is particularly lacking in any evidence that Mother planned to remove G. from California. Father's ex parte application for an order on May 21 was devoid of any evidence in support of the assertion Mother planned to take G. to Texas. After the court issued the ex parte order he sought, Father filed a declaration before the noticed June 12 hearing that did aver G. said Mother was going to become a teacher and move with her fiancé to Texas. Other than this single reported statement, Father offered nothing else to indicate that Mother had any plans to take G. to Texas. Furthermore, Father's declaration offered G.'s alleged statement solely for "its effect on the listener (me)." By contrast, Mother's declaration filed the day before the June 12 hearing denied any intention to take G. to Texas and set forth myriad facts explaining why there was no risk she would do so, including her ties to California, her fiancé's ties to California, and her lack of any ties to Texas (other than, of course, her fiancé's support of Dallas's football team).

Second, the family law court checked the appropriate box on the Judicial Council form to indicate it found a risk that Mother would abduct G. because, in the form's words, she "has violated—or threatened to violate—a custody or visitation order in the past." The evidence Father offered to support that finding was the assertion in his June 3, 2014, declaration that Mother had failed to comply with a 2010 order that she place his name on G.'s birth certificate. Mother's responsive declaration asserted that she believed her stipulation to paternity obviated the need for her to add Father's name to the birth certificate because it enabled him to do so himself. The dispute on the point is immaterial. Even accepting Father's assertion and disregarding Mother's response, the

11

evidence regarding non-compliance with the 2010 order does not support a finding under the relevant statutory factor.

The Judicial Council form seeks to simplify and condense the section 3048 factors found at subdivisions (b)(1)(A) and (b)(1)(B). Looking to the statutory factors themselves, a violation of the 2010 order to add Father's name to G.'s birth certificate is not the type of conduct the statute directs a court to consider in assessing whether a risk of abduction is present. Subdivision (b)(1)(A) directs a court to consider "[w]hether a party has previously taken, enticed away, kept, withheld, or concealed a child in violation of the right of custody or of visitation of a person," and subdivision (b)(1)(B) directs a court to consider whether a party has threatened to do the same. (§ 3048, subd. (b)(1)(A) and (B).) Father's allegation that Mother failed to add his name to G.'s birth certificate is not evidence that Mother enticed away, kept, or concealed G. in violation of his right of custody or visitation. Father has not identified any other evidence in the record that would indicate Mother had withheld G. in violation of a custody order. There is, in fact, evidence in the record that points in the opposite direction: a May 26, 2014, declaration from Mother (with supporting documentation) stating (1) that G. missed only three visits during two years of monitored visitation with Father, and those only because G. was sick on two occasions and the monitor was unavailable on the third; and (2) that G. had not missed any of her custodial time with Father after the family law court made its initial custody determination in December 2013.

Third, the family law court relied on Mother's history of not cooperating with Father in parenting to find there was a risk that Mother would take G. without permission. There was an acrimonious relationship between Mother and Father; based on the history of the proceedings, the court had a basis to conclude that the acrimony was due at least in part to Mother's lack of cooperation in parenting. For many of the reasons already discussed, however, there was negligible evidence that Mother's lack of cooperation was probative of a risk that she was planning to abduct G. Moreover, a lack of cooperation in parenting is (regrettably) a common feature of contested custody cases.

12

In the absence of more extreme circumstances not present here, the existence of a lack of cooperation alone is not substantial evidence of a risk of abduction.

We therefore conclude the finding that there was a risk Mother would abduct G. was not established by evidence that is "reasonable in nature, credible, and of solid value." (*Dept. of Parks*, *supra*, 233 Cal.App.3d at p. 830.)

**III**

The parties also address whether the challenged orders are justified pursuant to sections 3063 and 3064. Section 3063 provides that "[i]n conjunction with any ex parte order seeking or modifying an order of custody, the court shall enter an order restraining the person receiving custody from removing the child from the state pending notice and a hearing on the order seeking or modifying custody." Section 3064 operates as a limitation on section 3063 and states that a court "shall refrain from making an order granting or modifying a custody order on an ex parte basis unless there has been a showing of immediate harm to the child or immediate risk that the child will be removed from the State of California."[6] (§ 3064, subd. (a).) The California Rules of Court, rule 5.151(d)(5) imposes additional obligations on a party proceeding under section 3064. The rule requires, among other things, the moving party to describe the date and details of the most recent incidents showing immediate harm to the child or an immediate risk the child would be removed from this state.

The family law court made no finding of immediate harm to the child in issuing the challenged orders, so we do not address that aspect of section 3064 here. Further, for the reasons we have already given in connection with section 3048, we hold no substantial evidence was before the court to justify an order under section 3064 based on an immediate risk G. would be removed from California.

---

**6**     Section 3064 further defines "immediate harm to the child" to include situations that involve a parent who has committed acts of domestic violence or that involve sexual abuse of the child. (§ 3064, subd. (b).)

13

**IV**

For purposes of discussion, we have individually analyzed the factors and the evidence before the family law court, but we emphasize we reach a conclusion as to whether the orders are supported by substantial evidence by considering all the evidence before the family court as a whole. For the reasons we have discussed, the evidence was insufficient to support issuance of the orders under section 3048 or section 3064.

Because we conclude the challenged restraining orders were issued in error and the error was prejudicial, we need not consider Mother's alternative arguments for relief. Mother withdrew her "move away" request on May 22, 2014, in the face of Father's ex parte application, and thus the issue was not decided by the family law court. Whether Mother is entitled to move with G. to Tehachapi and whether such a move would impact the court's custody determination are questions not before us, and we express no opinion on either issue. We are confident the family law court will be able to address either or both questions in the first instance, if presented.

14

## DISPOSITION

The May 21, 2014, injunctive order, as continued in force by the Superior Court's order of June 12, 2014, is reversed.  Appellant is to recover her costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We Concur:

TURNER, P.J.

MOSK, J.

15