Filed 5/5/22  In re J.G. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| | D079673 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520590A) |
| Plaintiff and Respondent, | |
| v. | |
| J.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Tilisha T. Martin, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Donna P. Chirco, under appointment by the Court of Appeal, for Minor.

Jorge G. (Father) appeals an order in the Welfare and Institutions Code section 300 dependency proceeding for J.G., granting sole legal and physical custody of J.G. to M.R. (Mother).  Specifically, Father challenges the juvenile court's denial of his request to be elevated to presumed parent status pursuant to Family Code section 7611, subdivision (d).[1]  Father also contends he was prejudiced because the court did not rule on his presumed status until after the six-month family maintenance review hearing, following J.G.'s placement with Mother at the disposition hearing.  Based on our review of the record, we conclude there is substantial evidence to support the court's finding that Father had not fully developed a parental relationship with J.G. and therefore did not qualify for presumed status.  Father was not prejudiced by the timing of such finding because an earlier ruling denying Father presumed status would not have changed the outcome of the custody orders. We therefore affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Petition and Detention Hearing*

In November 2020, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under Welfare and Institutions Code section 300, subdivision (b), on behalf of J.G., who was five and a half years old at the time.  The Agency alleged Mother used dangerous drugs as evidenced by Mother testing positive for amphetamine and methamphetamine at the birth of J.G.'s half sibling, M.G., in November

---

[1]    All further statutory references are to the Family Code unless otherwise specified.

[2]    In light of the limited scope of this appeal, we provide an abbreviated summary of the dependency proceedings focused on the facts relevant to the issue on appeal.

2020.[3]  The next day, Mother admitted to using the drugs two days before giving birth to M.G. but denied needing substance abuse services.  Mother also informed the Agency that M.G.'s father was in Mexico and J.G.'s father was deceased.  J.G. was detained in a foster home.

Ten days later, Mother informed the Agency that Father was in fact not deceased.  She previously claimed he was deceased because, according to Mother, Father is a gang member and she did not feel that it was safe for J.G. to be with him.  In its detention report, the Agency reported Father's whereabouts were unknown.  At the detention hearing on December 1, 2020, the court ordered the Agency to continue all search efforts for Father.

B. *Father's First Appearance in the Proceedings*

In its December 18, 2020 jurisdiction and disposition report, the Agency indicated it was able to contact Father, who lived in Washington but was currently living with his aunt in Los Angeles, in order to obtain custody of J.G.  According to Father, he was documented on J.G.'s birth certificate, however, the Agency was waiting for a copy of the certificate to confirm.  Father reported he last saw J.G. two years prior.

Mother also stated she last spoke to Father two years prior.  According to Mother, Father was shot and became paralyzed when she was pregnant with J.G. in Washington.  J.G. was born in May 2015, and Mother left Father for J.G.'s safety.

When a social worker asked J.G. who M.G.'s father is to her, she said " '[w]e are family.' "  Referring to Father, J.G. stated " '[m]y other dad lives far far away.' "  When asked whether she would like to live with her " 'other dad,' " J.G. stated " 'I don't want to go there, it is far far away.' "  J.G. was

---

[3]    M.G. is not a subject of this appeal.

doing well in the foster home, and said " 'I love it here, I like the place where I live.' "

The Agency indicated it would continue to assess the appropriateness of placing J.G. with Father, but still needed additional information. If Father were elevated to presumed status, the Agency would assess him for services. As for Mother, she was enrolled and engaged in a treatment program. The Agency recommended that J.G. be declared a dependent and be placed out of the home.

Father made his initial appearance at the jurisdiction and disposition hearing on December 18, 2020. His attorney requested that he be elevated to presumed status pursuant to section 7611, subdivision (d), arguing Father lived with Mother and J.G. as a family for the first two and a half years of J.G.'s life. Father also held J.G. out as his child to everyone including family, friends, and co-workers, and provided J.G. with food, clothing, and housing.

Mother's attorney argued Father did not qualify as a presumed father under section 7611, subdivision (d) because, according to Mother, Father never lived with J.G.[4] Mother claimed J.G. was in her care, and she lived with maternal grandfather. Mother also did not recall Father being at the hospital for J.G.'s birth or signing any documentation to be named on the birth certificate.

The clerk verified that there was no paternity declaration on file. The court ordered Father to submit to genetic testing and deferred on the issue of paternity.

C. *Father Sets Trial on Paternity and Mother Sets Trial on Disposition*

In its February 17, 2021 addendum report, the Agency informed the court that J.G. was moved to M.B.'s home on December 28, 2020. Father

---

4    Mother later testified that Father did live with J.G., as discussed *post*.

4

indicated that he had been talking to J.G. and that J.G. said she missed him. M.B. confirmed Father calls J.G. consistently. However, she reported J.G. tells Father that she "does not want to go with him" and that she no longer wants to talk to him. Father stated he would most likely return to Washington because he felt bad staying at his aunt's house, but he was going to do everything possible to have visits with J.G. J.G. told the Agency that Father "misses me but I don't want to go with him, it is scary." She said it was scary "[b]ecause I want to go with my mom." The Agency indicated that it would continue to assess Father's ability to care for J.G. if he is elevated to presumed status, however, it was hopeful Mother would reunify with J.G. as she continued to demonstrate positive behavioral changes.[5]

At the next hearing, Mother indicated she would be asking for placement of J.G. with her and sought an evaluation of her home in Ensenada, Mexico. Mother set trial on disposition, and Father set trial on paternity. The court sustained the allegations of the petition under Welfare and Institutions Code section 300, subdivision (b), and declared J.G. a dependent pursuant to section 360, subdivision (d). Due to the need for further investigation regarding potential placement in Mexico, the court bifurcated the hearing on disposition.

D. *Father's In-person Visits with J.G.*

In its addendum report prepared on April 2, 2021, the Agency reported that Mother was still testing negative, was meeting all of her goals in her treatment plan, and finished her parenting classes. The Agency also reported the genetic testing results showed that Father is the biological father of J.G. The Agency arranged plans for Father to travel from Washington to San

---

[5] All of Mother's drug testing was negative and her case manager reported she was addressing everything in her treatment plan.

Diego to visit with J.G. in person the weekend of April 2-4, 2021.  Father requested to visit with J.G. during the day and not overnight because he did not want to make her uncomfortable, stating " 'I am happy to see my baby, but she hasn't seen me in a while.' "  Father wanted to visit with J.G. as much as possible to " 'get to know her better.' "  The Agency agreed that J.G. "needs to get to know her father" and indicated a commitment to fostering the relationship of Father with J.G.

In its subsequent addendum report prepared on April 5, 2021, the Agency reported that J.G. was "very excited" to see Father.  When she first saw him on April 2, 2021, she said " 'daddy, daddy,' " ran up to him, and gave him a hug.  J.G. "appeared very comfortable" around Father as they talked to each other.  Father told J.G. how much he loves and misses her, and asked about her school.  Father had snacks and a drink for J.G. and they watched cartoons while Father continued to interact with J.G.  He was tickling J.G., making her laugh, and practicing ABC's with her.  Father helped J.G. while she was eating dinner, and helped her clean up.  This visit lasted from 4:00 to 6:00 p.m.

The next morning, J.G. was excited to see Father again and told a social worker she missed Father after seeing him the day before.  Father greeted J.G. with flowers and they were both happy to see each other. He gave her a Minnie Mouse that he kept from when she was younger, which she remembered.  Father also brought J.G. snacks and a drink, and they talked by the hotel pool.  They watched cartoons and Father played music for J.G. to dance.  During lunch, Father cooled down the food for J.G. and helped her clean her face.  J.G. asked to sit in Father's lap on his wheelchair to and from the restaurant.  This second visit lasted from 1:00 to 5:00 p.m.

Father visited with J.G. from 10:00 a.m. to 2:00 p.m. the next day. J.G. was excited to see Father again. She brought her Minnie Mouse and proudly told a social worker that Father gave it to her, and that it was from when she was younger. J.G. greeted Father with a hug and gave him a Hershey's kiss and paintings she made for him. They played in Father's hotel room with J.G. constantly giggling and laughing. At the end of the visit, they gave each other a hug and a kiss. Father expressed his love to J.G. and the Agency reported "the feelings were mutual."

Despite Father and J.G. not seeing each other in person since September 2018, the Agency indicated that "the two bonded well and were comfortable with each other." J.G. was "extremely excited" to see Father each time, and listened to him when he would redirect her or give her advice about a topic. Father informed the Agency that he did not want to take J.G. away from Mother, but he would like to share custody. He also indicated he had plans to stay with his aunt in hopes to have more visits with J.G. in the future.

The Agency reported Mother continued to make substantial progress in her substance abuse treatment. Thus, the Agency changed its recommendation to placement with Mother, with family maintenance services. The Agency recommended that Father be granted unsupervised visits with J.G., and that Mother be required to communicate with Father and the Agency to arrange visitation.

E. *Father Is Elevated to Biological Parent Status and J.G. Is Placed with Mother*

At the disposition hearing on April 5, 2021, J.G.'s counsel asked the court to not set placement yet due to the need for further investigation of the family support situation in Mexico. Father asked the court to elevate his

status to biological parent and sought placement of J.G. in his care if the court did not place J.G. with Mother. Father's counsel also indicated that he may seek to elevate Father to presumed status under section 7611, subdivision (d). The court entered a judgment of paternity elevating Father's status to biological parent. It also indicated its tentative ruling to place J.G. with Mother at the appropriate time, but ordered that J.G. remain with M.B. for the time being.

At the continued disposition hearing on April 23, 2021, J.G.'s counsel informed the court that she and the Agency were able to resolve the remaining issues regarding the family support in Mexico. Based on that, J.G.'s counsel submitted on placement with Mother in Mexico. Father indicated he was prepared to have J.G. placed in his care in the event placement with Mother in Mexico failed. He also wanted to ensure a visitation schedule is established to allow him as much contact as possible by phone, video, and in person. The court placed J.G. with Mother and ordered unsupervised visits for Father. The court set a family maintenance hearing for October 20, 2021.

F. *Family Maintenance Hearing*

In its status review report for the family maintenance hearing, the Agency stated Mother had changed the circumstance that led to the Agency's involvement by engaging in services such as substance abuse treatment and parent education, and by maintaining her sobriety. The Agency also reported that it had attempted to schedule and arrange in-person visits for Father, but he declined. Father informed the Agency that he keeps in touch with J.G. by weekly phone calls or video chats, and he would notify the Agency if he changed his mind about in-person visits. The Agency recommended that the court terminate jurisdiction and issue custody exit orders for J.G.

8

At the review hearing, Father set trial for joint legal custody and a visitation schedule allowing Father to have J.G. with him for fifty percent of the time. Mother's counsel was surprised since Father had not reached out to the Agency or Mother to request any in-person visitation in the past six months. J.G.'s counsel added that the court ordered unsupervised visits at the April 23, 2021 disposition hearing, but Father had not attempted any in-person visitation since that time. The court scheduled a trial regarding the custody orders on November 1, 2021.

G. *Father Is Denied Presumed Parent Status and Jurisdiction Is Terminated*

At trial, Father indicated he was not challenging physical custody, but was seeking fifty percent legal custody and a liberal visitation schedule, including at least one weekend per month, an extended visit over the summertime, and a visit over the Thanksgiving or Christmas holiday.

Father testified he resides in Washington but was currently living in California. He planned to stay in California for as long as it takes to gain fifty percent custody. Additionally, Father intended visits with J.G. to occur in California, not Washington. He claimed to have the financial ability to take care of J.G. and provide her with food, housing, and clothing when she is with him.

According to Father, J.G. and Mother lived with him in Washington from the time that J.G. was born in 2015 until the end of 2017. Prior to the visitation during this case, the last time he saw J.G. was September 3, 2018. His last in-person visit with J.G. was April 3, 2021. Since then, he was informed he could have more visits, but he testified that it was not easy for him to travel, and J.G. would also have to travel to the border just for a four-hour visit. However, he video chats or talks to J.G. over the phone almost every day.

9

Mother confirmed Father lived with J.G. in Washington from 2015 to 2017. She testified that during that time, however, Father was not involved in J.G.'s care. Instead, Mother was taking care of Father and his wounds that he suffered from being shot. Additionally, it was mostly Father's parents providing financial support because he could not work. Father was able to supervise J.G. alone; however, Mother would only leave J.G. in his care when she would shower or cook.

Mother testified that she moved to California in 2017, and since then, Father had not had any involvement in J.G.'s life. In the past three years, Father had not contributed to J.G.'s care and support. Additionally, Father had never taken J.G. to the doctor nor had any involvement in J.G.'s schooling. Mother testified that she started having contact with Father again as a result of this dependency case. She has had J.G. in her care since April 23, 2021, and Father has not made any effort to see J.G. since then. Mother testified that bringing J.G. from Mexico to San Diego for visitation with Father could be an eight-hour trip, and is also expensive.

Father argued he qualifies as a presumed parent under section 7611, subdivision (d), based on Mother's and his testimony that he lived with J.G. and Mother from 2015 to 2017.

The Agency argued Father should not be elevated to presumed status, disagreeing that Father received J.G. into his home and held her out as his own. The Agency informed the court that Mother has shown incredible progress and J.G. has been doing well since being placed back in Mother's care. The Agency urged the court to terminate jurisdiction and execute custody orders.

J.G.'s counsel joined the Agency's arguments that Father "never really received" J.G. into his home and that the court should terminate jurisdiction.

Mother argued that evidence she and J.G. lived with Father for a period of time while Mother helped Father recover from injuries, was insufficient evidence to support elevating Father to presumed status. Mother expressed a willingness to commit to allowing Father to have a four-hour visit once a month, with the understanding that this could be expanded as J.G. becomes more comfortable and Father demonstrates an effort to develop his relationship with J.G. With that, Mother requested that the court terminate jurisdiction.

The court found that although J.G. lived in the home with Father from 2015 to 2017, Father had not developed a full parental relationship with J.G. because J.G. had been under the primary care of Mother since birth. Additionally, it was a "grave concern" for the court that prior to the visitation in this case, Father had not seen J.G. since September 2018. There was no evidence Father sought to have contact with J.G., asked the court for assistance in being able to see J.G., or took any steps to solidify J.G. as his natural child. Once Father had an opportunity to develop his relationship with J.G. during the dependency proceeding, he declined. The court acknowledged Father was now willing to be present, assist, and care for J.G.'s well-being. However, a finding of presumed status requires that the parental relationship already be established. Thus, the court denied Father's request to be elevated to presumed father status under section 7611, subdivision (d).

The court terminated jurisdiction, placed J.G. with Mother, and granted Mother sole legal and physical custody of J.G. The court also issued custody orders granting Father a minimum of one unsupervised visit for four hours per month. This would allow Father to develop a parental relationship

11

with J.G. and Father would be able to increase his visitation after demonstrating consistency for the best interest of J.G.

## DISCUSSION

Father contends there was insufficient evidence to support the juvenile court's finding that he did not qualify as a presumed father under section 7611, subdivision (d). We disagree. Substantial evidence supports the court's finding that Father had not fully developed a parental relationship with J.G. and was therefore not entitled to presumed status. Accordingly, we affirm the court's order.

A. *Applicable Law*

A man is presumed to be the natural father of a child if the man both receives the child into his home and openly holds the child out as his natural child. (§ 7611, subd. (d).) " ' " [T]he statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' " . . . "[T]he premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare . . . is entitled to the elevated status of presumed fatherhood." ' " (*Jason P. v. Danielle S.* (2017) 9 Cal.App.5th 1000, 1019.) Thus, "[a] person requesting presumed parent status under section 7611, subdivision (d) must have a 'fully developed parental relationship' with the child." (*In re M.Z.* (2016) 5 Cal.App.5th 53, 63 (*M.Z.*).)

"Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802 (*Jerry P.*).) The person claiming entitlement to presumed status has the burden of establishing, by a

12

preponderance of the evidence, the facts supporting that entitlement. (*M.Z.*, *supra*, 5 Cal.App.5th at pp. 64-65.)

On appeal, we review a finding of presumed parent status under the substantial evidence standard. (*M.Z.*, *supra*, 5 Cal.App.5th at p. 64.) In applying this standard, "[w]e view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence. [Citation.] If there is substantial evidence to support the ruling, it will not be disturbed on appeal even if the record can also support a different ruling." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780.) Alternatively stated, we must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary ruling. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168; *In re Manuel G.* (1997) 16 Cal.4th 805, 823.) On appeal, the appellant has the burden to show there is insufficient evidence to support the juvenile court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103; *In re N.M.*, at p. 168.)

B. *Substantial Evidence Supports the Court's Finding that Father Did Not Qualify for Presumed Parent Status*

Father argues there is "no question" he took J.G. into his home and held her out as his daughter for the first two and a half years of her life. He contends the court failed to consider that Mother took J.G. away from him when she left Washington in 2017. While he did not take J.G. to the doctor, participate in her schooling, or contribute to her care in the three years after Mother and J.G. left Washington, Father argues there is no indication Mother took care of J.G.'s medical issues either, and J.G. was not in school during that time.

13

Father also argues the three visits in April 2021 during the dependency proceedings "indicated a fully developed parental relationship." He contends J.G.'s "reactions when with Father demonstrated that they were in fact a bonded family." According to Father, he "satisfied the burden of proving he had a parental relationship with his daughter when the social worker reported that 'the two bonded well and were comfortable with each other.' " Father concedes he failed to follow up with more in-person visits but argues the court failed to consider that he is in a wheelchair making it difficult to travel and J.G. resided in Mexico five hours from the border. Father asserts the hardship of in-person visits under these circumstances "must define the context of the importance of in-person visits" when he and J.G. have almost daily virtual visits.

Contrary to Father's assertions, we conclude substantial evidence supports the juvenile court's finding that Father had not fully developed a parental relationship with J.G. and was therefore not entitled to presumed status under section 7611, subdivision (d).

Mother and J.G. lived with Father for two and a half years in Washington from the time J.G. was born in May 2015, until the end of 2017. Viewing the evidence in the light most favorable to the ruling, Father did not actually care for J.G.'s welfare during that time. The record shows he only watched J.G. for short periods such as when Mother showered or cooked. Additionally, Father was unemployed and provided no financial support for J.G.

Once Mother and J.G. moved away from Father in 2017, Father did not keep in contact with Mother and there is no evidence he made any effort to develop or maintain his relationship with J.G. Regardless of Father's explanation for not taking J.G. to the doctor or participating in her schooling

14

during this time, the record shows Father had no involvement in J.G.'s care or support whatsoever. Father claims he did not know whether Mother took J.G. to California or Mexico, however, there is no evidence Father attempted to locate J.G. or contact Mother. The last time Father saw J.G. prior to the juvenile dependency petition (filed in November 2020) was in September 2018. Father still made no effort to keep in contact with J.G after that point.

The record shows Father did not see J.G. again until April 2021, as a result of this case. Those three consecutive in-person visits—albeit positive visits—almost three years later did not require the court to find that Father had a fully developed relationship with J.G. By that time, J.G. was already six years old and had not seen Father for most of her life. Additionally, regardless of any difficulty caused by Father's disability or J.G.'s geographical distance, evidence that Father did not pursue *any* subsequent in-person visits, and in fact declined the Agency's assistance in coordinating visits prior to the court's presumed status ruling in November 2021, shows Father had not demonstrated a full commitment to J.G.

Having reviewed the record as a whole, we conclude there is substantial evidence to support the juvenile court's finding that Father had not established a fully developed parental relationship with J.G. and was therefore not entitled to presumed status under section 7611, subdivision (d).

C. *Father Was Not Prejudiced by the Timing of the Court's Presumed Parent Finding*

Father argues he was prejudiced by the court's delayed presumed status ruling. Father wanted shared custody, however, the court did not rule on his presumed status until after the six-month family maintenance review hearing, after J.G. was already placed with Mother at the disposition hearing. Father states that had the court found him to be a presumed father

15

early in the case, he would have been entitled to reunification services. Indeed, "[a] father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) "Presumed father status ranks highest," entitling the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan. (*Jerry P.*, *supra*, 95 Cal.App.4th at p. 801; Welf. & Inst. Code, §§ 317, subd. (a), 361.2, subd. (a), 361.5, subd. (a).) Father's prejudice argument fails because an earlier ruling denying Father presumed status would not have changed the outcome of the custody orders. To the extent Father speculates that the court would have granted Father presumed status if it had made its ruling earlier, Father provides no support for such speculation. Moreover, Father's argument that the court should have granted him presumed status earlier, which would have entitled him to reunification services, potentially leading to joint custody, puts the cart before the horse. The purpose of the parentage presumption is to preserve an already fully developed ongoing parent and child relationship—not to allow a parent to obtain services and/or more time to develop a relationship with the child. (See *R.M. v. T.A.*, *supra*, 233 Cal.App.4th at p. 773 ["The parentage presumption is derived from the ' "strong social policy in favor of preserving [an] ongoing [parent] and child relationship." ' "].)

16

## DISPOSITION

The juvenile court's order is affirmed.


IRION, J.

WE CONCUR:



AARON, Acting P. J.



DO, J.