Filed 7/3/24  In re Jeremiah M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re JEREMIAH M., a Person Coming Under the Juvenile Court Law. | B323166 (Consol. w/B328516) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff, <br><br> v. <br><br> J.M., <br><br> Defendant and Appellant; <br><br> D.V., <br><br> Intervener and Respondent. | (Los Angeles County Super. Ct. No. 22LJJP00144A) |

APPEALS from findings and orders of the Superior Court of Los Angeles County. Stephanie M. Davis, Commissioner. Reversed and remanded.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance for Plaintiff.

———————————

J.M. (Father) appeals the trial court order denying his request to be deemed the presumed father of Jeremiah M. The trial court understandably, but erroneously, concluded that Father denied that Jeremiah was his son. After excluding this erroneous fact, the trial court's finding cannot stand. When the domestic violence underlying this case occurred, Father lived with infant Jeremiah in Father's home, which Father shared with D.V. (Mother). Jeremiah lived with Father for six months, the entirety of Jeremiah's life prior to Mother implementing a safety plan to move out with Jeremiah. Father's uninterrupted time with Jeremiah in his home, together with his claims that Jeremiah is his son mandate that he be Jeremiah's presumed father. Consequently, we reverse the trial court's finding.

## BACKGROUND

### I. Facts regarding parentage

#### a. Detention report

The initial referral indicated that Mother, Father, and Jeremiah lived in the same home. According to the reporting party, Father punched Mother's body and legs when she was breast feeding Jeremiah. The domestic violence took place on

2

March 3, 2022.  Mother and Jeremiah moved out after the domestic violence incident.

Jeremiah was born more than six months before the initial referral.

On March 14, 2022, in an interview with a social worker, Mother indicated that she capably coparented with Father after moving out.  Mother took Jeremiah to visit with Father three times for two-hour visits.  She lived with Father for the previous two years.  In addition, Father had children from a previous relationship and was "great with his kids" and a "wonderful father."

On March 15, 2022, a Los Angeles County Sheriff's deputy spoke to Mother via telephone.  Mother indicated that she moved out of the family home after domestic violence.

On March 16, 2022, a social worker spoke with Mother's therapist who reported that Mother also told her that Father hit Mother while she was breastfeeding.  Thereafter, Father prevented Mother from leaving the family home.  The maternal grandfather and a maternal uncle came to Mother's assistance so she could move out.[1]

On March 23, 2022, a social worker spoke to a confidential neighbor who reported domestic violence concerns endangering Jeremiah.  This neighbor reported hearing screaming and shouting because Father was attacking Mother and called the police once.  The neighbor also reported that Mother and child were in the home.  In addition, this neighbor said that Father engaged in domestic violence with his previous partner.

---

[1]     We refer to the family members based on their relation to Jeremiah.

On March 25, 28, and 29, Father called a social worker from a blocked number, left messages, but did not leave a call-back number.

On April 4, 2022, a social worker spoke with Mother who reported she and Father agreed to seek court orders to address Jeremiah's custody and visitation because both parents thought structured visitation would be in Jeremiah's best interest. However, on two occasions, Mother was turned away from court because she did not have the proper paperwork. Mother and Father were trying to have Father visit three consecutive days, but Father's work schedule was challenging. For the time being, Mother brought Jeremiah to visit with Father on Sundays for three hours.

On April 5, 2022, a social worker went to Father's home to interview him. Father initially denied his identity, but the social worker saw Mother walk out of the garage with Jeremiah. Father then admitted his identity. According to Father, Mother already told DCFS everything. Father said, "What I can tell you is, I love my children." Father denied hitting Mother, claiming it was a "misunderstanding." Jeremiah was fine, and Father urged the social worker to make "[t]he right decision." Father denied having the characteristics of a gang member saying, "This is a good home." Father said that Jeremiah would not be removed from his home, and that the social worker "owed" him. God blessed Father with his first son Jeremiah, and it was hard not to see him. For six months, Jeremiah was in his home, and Father does not get to wake up to Jeremiah because of differences with Mother. The social worker explained the potential for family maintenance services and family reunification services. In addition, Father was upset that a social worker spoke to the

4

mother of his daughters from another relationship, and was upset that he could not visit with his daughters. Father expressed frustration that the domestic violence allegation regarding Jeremiah affected his relation with his daughters from another mother.

On April 5, 2022, a social worker interviewed a maternal uncle. The maternal uncle said that Mother recently split from Father and now resided with maternal relatives. He heard that Father would not let Mother leave the home and Mother contacted the maternal grandfather. He stated another maternal uncle and the maternal grandfather went into Mother's former home to gather Mother's and Jeremiah's belongings.

On April 5, 2022, a social worker again spoke with Mother. Mother stated that Father was visiting Jeremiah on weekends and she had no concerns about his visitation. Mother was going to family court to secure custody and visitation. She told Father that they needed to work on issues separately to benefit their child. Mother again confirmed that she was the victim of domestic violence while Jeremiah was in her arms. In addition, she stated that Father asked law enforcement to conduct a welfare check on Jeremiah when Father had not seen Jeremiah in a week.

On April 8, 2022, Father called a social worker for assistance in securing visits with his daughters from another mother. Regarding this case, Father was in favor of court orders defining visits with Jeremiah. This social worker explained to Father that he would likely have to complete domestic violence and parenting programs. Father agreed to participate in the services.

On April 13, 2022, the trial court authorized emergency removal of Jeremiah from Father. On the same day, a social worker informed Father of the emergency order. The social worker informed Father that his contact with Jeremiah was to be monitored. Father said the news was hard to hear, but he was thankful that Jeremiah could be with Mother.

In the detention report, Mother reported that Father is Jeremiah's biological father. Similarly, Father reported being the child's biological father.

DCFS asked for "Jeremiah to be removed from the care of father." DCFS indicated that Mother and Jeremiah relocated to the home of maternal grandparents after Father's domestic violence.

DCFS reported Mother and Father "have shown strength in their ability to co-parent following the incident."

### b. Detention hearing

On May 2, 2022, at the detention hearing, Father asked for Jeremiah to be released to him. Alternatively, Father asked for visitation. While asking for release and visits, Father also asked for a DNA test. The trial court detained Jeremiah from Father and denied Father's request for visits while noting his contradictory positions, where he sought custody while simultaneously requesting a DNA test. To support its ruling, the trial court made findings that "continuance in the home of the father is contrary to the child's welfare." The court also granted Father's request for a DNA test and ordered monitored visits upon DCFS receiving test results confirming Father is Jeremiah's father.

At the detention hearing, Father submitted a JV-505 form through his counsel. Counsel signed the form, and Father did not

sign, noting "no signature due to covid." Father checked box No. 4, which provides, "I do not know if I am the parent of the child and I [request] blood or DNA testing to determine whether or not I am the biological parent." Father also checked box No. 8, which provided, "I believe I am the parent of the child and request that the court find that I am the presumed parent of the child." Under the same box, he checked boxes and filled in blanks indicating, "The child lived with me from Birth to Removal"; "I have told the following people that the child is mine: Family and Friends"; "I have participated in the following activities with the child (*for example, school, daycare, sports*): Medical Appointments"; "I have given the following money or things to the child: Money, Toys, Clothes"; "The child has spent the following time with my family: Holidays and Recreation."

On July 8, 2022, at an interim hearing, the trial court received positive DNA results, found Father to be Jeremiah's biological father, and ordered monitored visits to begin. Father's counsel notified the trial court that Father may ask the court to name him a presumed father at the disposition.

### c.    Jurisdictional report

In its jurisdictional report, DCFS recommended that Jeremiah be removed from Father and that Father receive enhancement services.

In assessing whether a voluntary case was appropriate, in a single sentence toward the end of the report, DCFS reported that Mother was pregnant with a second child from Father.

### d.    Last minute report with Father's interview

On August 15, 2022, DCFS provided the trial court with a supplemental report where a social worker interviewed Father. Father mostly denied any domestic violence although he conceded

7

a "quick slap" to Mother's right calf. Father also indicated that he was not visiting Jeremiah. The report further reads:

"Father was asked if he plans to reconcile with mother and he stated, 'No, no, I don't want to.' Father was asked about mother's pregnancy[,] and he stated, 'I need to know if that's my baby. If that baby is mine, I'm gonna take care [of] that baby. I plan to work with [Mother] to the best and co-parent.'"

### e. Paternity findings and Father's testimony

On August 22, 2022, the trial court held jurisdictional and dispositional hearings. During the proceedings, Father testified that he argued with Mother in the kitchen, and Jeremiah "did not wake up whatsoever during our dispute." He acknowledged that "due to the fact [of] her getting home late," a domestic incident followed. Regarding Jeremiah, Father conceded he had not visited and pointed to difficulty in communicating with the social worker as he attempted to contact her twice. In response to a question about whether he would do services to secure Jeremiah's return, Father said, "I'll do whatever it takes for my son. I will. He's my firstborn. He's my first son. Like I miss him." He also asked that Jeremiah be returned to his care explaining, "I know how to have my son happy." In response to a question regarding how many children he had with Mother, he stated, "One. My son, Jeremiah." If Jeremiah was removed from him, Father asked for Jeremiah to be placed with paternal relatives.

In the jurisdictional portion of the hearing, the court made a credibility finding against Father and found that he committed domestic violence and minimized it.

During disposition, Father's counsel sought return of Jeremiah to Father and for Father to be named Jeremiah's presumed father. Alternatively, Father sought unmonitored

8

visits.  Mother opposed Father being the presumed father.
The Court ruled:

"Again, the court is considering all of the evidence, including the sustained petition, and the evidence does include the father's testimony, which is again, contradictory to what he said in the reports.

"He was advised on or before July 8th that he was the biological father.  He was also given visits on that day.  As recently as his interview on August 11th, he continued to indicate that he needs to know if the baby is his.  The social worker did document efforts to set up visitation, and the father did not respond."

"For the reasons that have been stated by the court, despite [J.M.'s] statements in testimony, his actions demonstrate that he seems to apparently still be unsure about the biology of this child and his commitment to the child.  So the court is not going to exercise its discretion and is not going to provide [J.M.] with reunification—or enhancement services.

"Actually, the court is also going to exercise its discretion and note the biological father is not entitled to visitation, and the court is ordering no visits for [J.M.]."

In making its removal findings, the trial court relied on Welfare and Institutions Code section 361, subdivision (c), which defines the standard for removal from parents "whom the child resides at the time the petition was initiated."

## DISCUSSION

Father appeals from the trial court's finding at disposition that he did not carry his burden to establish a presumption that he is a presumed father.  Father also appeals from the exit order terminating jurisdiction.  Mother is the respondent.  DCFS took no position on this appeal.  We consolidated the appeals.

9

## I. Governing law

A person seeking to establish a rebuttable presumption that he or she is a presumed parent under Family Code section 7611, subdivision (d), requires that the presumed parent "receives the child into their home and openly holds out the child as their natural child." As the statute provides, a presumed parent must satisfy both prongs of this test to establish this rebuttable presumption. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051; *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774.)

Courts can consider a variety of factors to determine whether a parent has satisfied both prongs of Family Code section 7611, subdivision (d). (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 145.) This non-exhaustive list includes helping with prenatal care; assisting with pregnancy and birth expenses; legally attempting to obtain custody of the child; seeking to place a parent's name on the birth certificate; how long a parent cared for the child; unequivocally acknowledging the child; the number of people to whom a parent acknowledged the child; providing for the child after the child no longer resided with the parent; whether a parent's care was incidental; and completing paperwork for public benefits if applicable. (*In re J.H.* (2011) 198 Cal.App.4th 635, 646.)

We review the trial court's finding that a parent did not qualify as a presumed parent under Family Code section 7611, subdivision (d), for substantial evidence. (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 492.) Generally, the substantial evidence standard is a deferential one. (*Ibid.*) This is especially true where an appellant had the burden in trial court, as Father did here. (*R.M. v. T.A., supra*, 233 Cal.App.4th at p. 774.)

10

In that context, the substantial evidence standard requires an appellant to demonstrate the evidence compels a finding in their favor. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.) The appellant must point to evidence that was uncontradicted and unimpeached so that the record leaves no room for any other finding. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010.)

## II. Father's evidence compels a finding in his favor

Here, the trial court primarily erred because the confusing record led the court to believe that Father disclaimed parentage in the weeks before the dispositional hearing when he did not.

Initially, we look to the first prong for presumed parentage under Family Code section 7611, subdivision (d), whether Father received Jeremiah into his home. In its removal findings, the trial court found that Father was a custodial parent by relying on Welfare and Institutions Code section 361, subdivision (c), which applies to parents with "whom the child resides at the time the petition was initiated." Moreover, Mother indicated that she lived with Father for the two years preceding her interview with a social worker. Thus, Mother lived with Father throughout her pregnancy and throughout Jeremiah's life until Mother left because Father struck her. From the dates in the record, Jeremiah lived in the family home for at least six months. Similarly, the maternal uncle noted that Mother and Father lived together after Jeremiah's birth. Mother also indicated to her therapist and a sheriff that she moved out of the family home after domestic violence. Even the anonymous report that instigated DCFS's investigation indicated that Jeremiah, Mother, and Father lived together when the domestic violence happened.

11

While we do not rely on Father's statements because of the trial court's credibility determination, we also note that Father stated that Jeremiah resided with him.  In his JV-505, Father stated that "The child lived with me from Birth to Removal."  In trial, Father also testified that Jeremiah should be returned to his care.

When a parent's " 'receipt of the child into the home [was] sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship,' " a parent satisfies this first prong.  (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145.)  While the statute does not identify any specific length of time necessary to meet this prong, living with a child for an extended period may improve a claim for presumed status.  (*Ibid*.)

Here, the trial court's findings and the evidence point to only one conclusion:  Father lived with Jeremiah for the entirety of Jeremiah's life until the domestic violence and "receive[d] the child into [his] home."  (Fam. Code, § 7611, subd. (d).)

Regarding the remaining prong, whether Father held himself out as Jeremiah's parent, the trial court's analysis was driven by an understandable factual error.  (Fam. Code, § 7611, subd. (d).)  The trial court reviewed an extensive record, and the only mention of another child was in a single sentence at the end of the jurisdictional report.  This sentence was not found in the summary of Mother's current circumstances where such a fact could presumably be found.  Instead, in assessing a potential voluntary case at the end of the report, DCFS noted that Mother was currently pregnant with a second child from Father.  Then a later supplemental DCFS report reads, "Father was asked about mother's pregnancy[,] and he stated, 'I need to know if that's my baby.' "  Because Jeremiah was so young and Mother had

12

recently been pregnant with Jeremiah, the trial court concluded that Father was denying parentage for Jeremiah. When read in context, however, the report can only be read to address Mother's ongoing pregnancy, and Mother was not pregnant with Jeremiah when Father made that comment. Rather she was pregnant with a different child, and Father expressed ambiguity regarding the parentage of that child.

In the record, Father claimed that Jeremiah was his son. In his first interview with a social worker, Father said that God blessed him with Jeremiah as his first son among other statements affirming parentage. In his trial testimony regarding Jeremiah, Father said, "He's my firstborn. He's my son." In response to a question regarding how many children he had with Mother at trial, Father stated, "One. My son, Jeremiah." Father also asked that Jeremiah be placed with him at the dispositional hearing, and alternatively asked that the child be placed with paternal relatives. The record compels the conclusion that Father held himself out as Jeremiah's parent. (Fam. Code, § 7611, subd. (d).)

To the extent that Father needs to establish other facts beyond Father sharing a home with Jeremiah for the entirety of Jeremiah's life and claiming parentage, the record has evidence to support additional factors as well. Mother said that she and Father were capable of coparenting in an early interview, indicating that both parents took parenting roles after the separation. She also indicated that Father was a "wonderful father." Mother also lived with Father throughout the time she was pregnant with Jeremiah. Further, according to Mother, she and Father were in favor of seeking court order to address Jeremiah's custody and visitation after the domestic abuse.

13

While Mother carried the laboring oar regarding preparing the paperwork for family court, Father supported pursuing custody and visitation orders for Jeremiah. After Mother moved out with Jeremiah, Father also visited Jeremiah as Mother brought Jeremiah to the former family home weekly. Even Father's inappropriate conduct was consistent with him asserting parentage as he attempted to influence and cajole a social worker to leave Jeremiah in Father's care because the social worker "owed" Father. In addition, DCFS credited the parents for coparenting Jeremiah following Father's domestic violence. While " 'it [is not] necessary for the person seeking presumed parent status to have entered into the familial relationship from the time of conception or birth,' " the record supports the conclusion that Father did so here. (*Jason P. v. Danielle S.* (2017) 9 Cal.App.5th 1000, 1024–1025.) The evidence compels the conclusion that Father assumed a parental role for Jeremiah.

Because of the credibility finding against Father, we do not consider factual information in his JV-505 form, but note that this information is consistent with this court's ruling as well. There, Father claimed to provide financial support for Jeremiah in the form of money, toys, and clothes, held himself out as Jeremiah's father to family and friends, took Jeremiah to medical appointments, and had Jeremiah spend holidays and recreation time with Father's family.

Mother asks us to affirm the trial court order because Father disclaimed parentage in his JV-505 form. This is the only fact in the record suggesting that Father did not hold himself out as Jeremiah's parent. In asking for a DNA test, Father checked a box providing, "I do not know if I am the parent of the child and I [request] blood or DNA testing to determine whether or not I am

14

the biological parent." This statement was part of a form and a mechanism to request a DNA test. Moreover, in the same form, Father also checked boxes indicating he was Jeremiah's presumed father and Father wrote in various facts supporting this contention as noted above. Given the overwhelming and uncontroverted evidence here, as Jeremiah lived his entire life in Father's home before the parents' separation resulting from Father's domestic violence, we decline to allow this form response to preclude Father from establishing parentage. Father requested the DNA test, but asserted parentage both before and after receiving test results confirming that he was Jeremiah's biological Father. Moreover, fathers can and do become presumed parents after asking for DNA tests. (*In re T.G.* (2013) 215 Cal.App.4th 1, 4, 9 [noting that a father requesting a DNA test became a presumed father].) The courts have not treated requesting a DNA test as a bar to parentage, and on this record, we do not find it sufficient basis to preclude Father from establishing parentage.

The trial court noted and Mother also points to Father's failure to visit Jeremiah. However, the trial court initially precluded Father from visiting Jeremiah when Father requested a DNA test at the detention hearing. Moreover, when Father's DNA test came back positive, and Father failed to set up visits with Jeremiah, only six weeks lapsed. This fact while not helpful to Father's case, does not preclude him from establishing facts compelling a result in his favor. Thus, Father's spotty record on visitation is at least partially explained by court orders precluding visitation. Because the uncontroverted facts support a finding of Father's parentage, this fact is insufficient to support the trial court's decision.

Mother also argues that Father failed to preserve the parentage issue for appeal because Father's counsel did not point out the Court's factual error during the dispositional hearing. We know of no rule requiring Father's counsel to correct the trial court's factual finding in real time, and Mother points us to none. Furthermore, Father's parentage was thoroughly litigated in the trial court, and Father argued he was entitled to be a presumed father. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338, rehg. den. Aug. 13, 1997 [waiver is appropriate where parent did not raise an issue in trial court].) Father preserved this issue for appeal by raising it below.

Regarding remand, we express no views on the appropriate visitation or custody order.

## DISPOSITION

The trial court order at disposition declining to elevate Father to presumed status is reversed. On remand, the court is instructed to enter an order declaring Father the presumed father of Jeremiah. The custody order is reversed and the matter is remanded for the trial court to conduct a hearing on custody of Jeremiah and Father's visitation.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.

16